Argued December 9; affirmed December 29, 1936; rehearing denied
January 26; costs disallowed February 9, 1937

# TITLE & TRUST CO. ET AL. v. DURKHEIMER
# INVESTMENT CO.

(63 P. (2d) 909, 64 P. (2d) 834)

428

In Banc.

*Omar C. Spencer,* of Portland (Carey, Hart, Spencer & McCulloch and Platt & Platt & Black, all of Portland, on the brief), for appellants.

*Robert F. Maguire,* of Portland (George W. Friede, Crandall & McCourt, and Maguire, Shields & Morrison, all of Portland, on the brief), for respondent.

This is a suit involving the validity of the forfeiture and termination of a lease of a six-story office building in the Portland business district and a sum of money, commenced on July 30, 1932.

On March 26, 1910, the predecessors in interest of defendant Durkheimer Investment Company, a corporation, leased to Harrison G. Platt, Robert Treat Platt and the Fidelity Trust Company, a corporation, certain premises situated on the southwest corner of Park and Washington streets in the city of Portland, county of Multnomah, state of Oregon, described as Lot one in Park Block No. 2 in the city of Portland for the term of thirty years commencing July 1, 1911, and ending June 30, 1941, the cash rentals varying from $1,000 a month to $1,500 a month. At the termination of the first lease in 1925, the rentals included (a) the cash rental of $1,200 per month; (b) the payment of all taxes and assessments; (c) the payment of insurance upon the building; (d) the erection as a part of the rental of a six-story office building at a cost of not less than $50,000; (e) at the expiration or sooner termination of the lease, the tenants to quit and deliver up the leased premises and all erections to or upon the same to the lessors.

After the execution of this lease, March 26, 1910, the lessees went into possession of the demised premises, razed the old building and erected thereon the Platt building, Class A, six-story store and office building, costing twice as much as the building required by the term of the lease. The lessees continued in possession and operation of said leased premises and the building thereon up to and including June 30, 1925, satisfactorily complying with the requirements of said lease in all respects. Prior to May 7, 1925, the Fidelity Trust Com-

pany was dissolved, all of its interest under said lease being taken over by Harrison G. Platt and Robert Treat Platt; also prior to May 7, 1925, all the interest of the individual owners of said leased premises was transferred to the Durkheimer Investment Company, the defendant. During the early part of 1925 negotiations were carried on which culminated in a written agreement dated May 7, 1925, by and between Harrison G. Platt and Robert Treat Platt, as lessees, and the Durkheimer Investment Company, as lessor, whereby the lease of March 26, 1910, was mutually terminated, and a new lease dated May 7, 1925, was executed, becoming effective as of midnight June 30, 1925. The agreement embodying the cancellation of the earlier lease provided in part as follows:

"Whereas the parties hereto have agreed to enter upon a new lease of said premises, to take effect July 1st, 1925, and to run for a period of ninety-nine (99) years thereafter, terminating at midnight of June 30th, 2024,

"Now, Therefore, It is Hereby Agreed by and between the parties hereto that, upon the execution, delivery and taking effect of said new lease, said lease of March 26th, 1910 shall terminate at midnight of June 30th, 1925, and thereafter the parties shall hold under said new lease."

The agreement shows that the termination of the first lease and the execution of the second lease constituted a single transaction, and as a result there was no interval of time from 1910 to July, 1932, during which the lessees were out of possession and control of the leased premises in the Platt building erected thereon in compliance with the terms of the first lease. Two provisions of the first lease read as follows:

"Fifth: The lessees, jointly and severally, covenant and agree during the term of said lease, and as a part

of the rent of said leased premises, to erect and construct upon said leased premises, in accordance with the building laws, ordinances and regulations of the City of Portland, Oregon, a store and office building of six stories or more in height, of the kind now designated by the building ordinances of the City of Portland as 'Class B', and at an expense of not less than fifty thousand ($50,000.00) dollars, and to erect said building at their own cost and expense, and will promptly pay the cost and expense of erection in such manner that no liens may attach to said leased premises or to the building to be erected thereon, and to commence the construction of said building on or before the first day of July, 1911, and complete the same on or before the first day of January, 1912,   *   *   *.''

''Ninth: The lessees, jointly and severally, covenant and agree   *   *   *   that at the expiration of said term, or upon any sooner determination thereof, if any, in pursuance of the conditions of this agreement, they will quit and deliver up the leased premises and all erections to or upon the same to the lessors, peaceably, quietly and in as good condition and order as the same now are or may be put in (reasonable wear and tear thereof excepted).''

By the terms of the lease of May 7, 1925, which we will hereafter refer to as the second lease, the Durkheimer Investment Company, as lessor, leased to Harrison G. Platt and Robert Treat Platt, as lessees ''those certain premises situated on the southwest corner of Park and Washington streets, in the city of Portland, county of Multnomah, and state of Oregon, described as lot one (1) in Park Block two (2) in the city of Portland, for the term of ninety-nine (99) years commencing July 1st, 1925, and terminating at midnight of June 30th, 2024.''

In the negotiations for the second lease the Platts agreed to pay the Durkheimer Investment Company $75,000, if it would terminate the old lease and enter

into a new ninety-nine year lease. This offer was accepted and the money paid to the defendant. This $75,000 was a part of the proceeds amounting to $175,-000 obtained from the sale of a bond issue secured by a trust deed on said premises and permitted by the terms of the second lease, the Title & Trust Company being the trustee for the bondholders.

The rent reserved in the lease paid to the lessor the first day of July, 1925, and on the first day of each month thereafter to and including the first day of June, 1926, was $1,200; on the first day of July, 1926, and on the first day of each month thereafter to and including the first day of June, 1931, the sum of $1,300; on the first day of July, 1931, and on the first day of each month thereafter to and including the first day of June, 1936, the sum of $1,400; thereafter increasing in specified amounts until the end of the term.

The lessees further agreed that as a part of the rent they would pay all the water rents and taxes assessed against said leased premises each year to and including the water rents and taxes which shall become due and payable in the year 2024 and also pay all assessments which may be lawfully levied against the demised premises during the term of the lease and pay such water rents, taxes and assessments prior to the maturity of the same, except where the lessees contested unlawful water rents, taxes and other charges, for which provision was made.

Paragraph 6 of said lease reads as follows:

"Insurance: The lessees shall, during the term hereof, keep the building now on said premises, or which, during the term, may be erected thereon, insured in a sum equal to two-thirds (2/3) of the insurable value of said building, said building to be insured in responsible fire insurance companies satisfactory to·

the lessor, and any loss or damage arising under said policies of insurance shall be made payable to The United States National Bank of Portland (Oregon) as trustee, or such other bank or trust company in the City of Portland, Oregon, as the lessor may, from time to time, designate. All insurance money received by the trustee shall be held,

(1) as security to the lessor for the performance by the lessees of all their obligations hereunder;

(2) for the purpose of repair or reconstruction of the building on the leased premises; and

(3) to pay to the lessees the balance, if any, after complete repair or reconstruction as herein provided.

The lessees shall pay all premiums on said insurance and keep the same in force.''

Paragraph 9 reads as follows:

''General Covenant: The lessees jointly and severally covenant and agree that they will make no unlawful, improper or offensive use of said leased premises, and will not suffer nor permit any strip or waste thereof, and that, at the expiration of said term, or upon any sooner determination thereof, if any, in pursuance of the conditions of this agreement, they will quit and deliver up the said leased premises and all erections to or upon the same to the lessor, peaceably, quietly and in as good condition and order as the same now are, or may be put in (reasonable use and wearing thereof excepted).''

Paragraph 11 reads as follows:

''Forfeiture: This lease is made on the express condition that if the lessees shall neglect or fail to do or perform or observe any of the covenants, promises or agreements herein contained which, on their part are to be performed, done or observed, and such neglect, failure or default shall continue for a period of sixty (60) days after written notice thereof shall have been given to the lessees, then, and in such case, the lessor may, at any time after the expiration of the sixty (60) day period after such notice, and while such neglect

or failure or default continues, terminate this lease, and re-enter into and upon the leased premises, or any part thereof in the name of the whole, and repossess itself of the same, and expel the lessees or those claiming under them, and remove their effects, (forcibly if necessary) without being taken or deemed guilty in any manner of trespass, and without prejudice to any remedy which it might have for arrears of rent or preceding breach of covenant; provided, however, that the lessor shall not have the right to terminate this lease for the failure on the part of the lessees to pay any water rents, taxes, assessments, or other charges, where they shall have given notice of intention to contest the same and a bond as hereinbefore provided. It is further provided that, if the lessees shall, at any time, incumber the leasehold estate by mortgage or deed of trust, as security for any actual indebtedness or contractual obligation, and written notice thereof shall have been given to the lessor by the lessees or by such mortgagee or trustee, then the lessor shall notify such mortgagee or trustee of any notices served by the lessor on the lessees, with a copy thereof, such notification and copies to be mailed to such postoffice address as shall be designated as the postoffice address of such mortgagee, by notice to the lessor by the lessees or the mortgagee or trustee. Such mortgagee or trustee shall have the right, at any time within sixty (60) days after receipt of such notice, to do any act or thing required of the lessees hereunder, and all such acts or things so done and performed shall be as effective to prevent a forfeiture of the rights of the lessees hereunder as if done by the lessees.''

The Platts assert that during the years following the World war, and increasingly from 1929 to 1932, renting conditions went from bad to worse; the economic depression became more and more serious, until it became impossible to collect sufficient income in the operation of the Platt building to pay the taxes on said building or to pay the interest accruing on said bonds,

even though supplemented by large sums of money contributed by the Platts from their other resources and income. The situation became acute in the spring of 1932, at which time the net receipts from the building became insufficient to pay even the ground rent called for by the terms of the second lease.

Strong efforts were made by the Platts to refinance the whole matter for the purpose of working out the payment of delinquent taxes and taking care of current taxes, but no satisfactory arrangement resulted. An endeavor was made to obtain from the lessor a reduction of ground rent. Consultations were held by the plaintiffs and defendant and a representative of the bondholders tending to that end. On May 23, 1932, the lessor forwarded to the lessees a letter reading as follows:

"Because of your delinquency in the payment of taxes and other rent, constituting a violation of the Lease made between yourselves and the Durkheimer Investment Company, the Durkheimer Investment Company hereby gives you notice to quit and deliver up to me, as Secretary, the possession of the premises known as The Platt Building, at Washington and Park Sts., Portland, Oregon, on or before the 24th day of July, 1932.

"Dated at Portland, Oregon, this 23rd day of May, 1932."

The letter was forwarded to the lessees by registered mail. A copy of this letter was forwarded in the same mail to plaintiff Title & Trust Company, trustee for the bondholders. On July 25, 1932, the lessor, pursuant to the requirements of paragraph 11 of the second lease, served upon the lessees personally a second notice which reads as follows:

"On May 23rd, 1932, we gave you written notice of your neglect and failure to perform and observe the

covenants, promises and agreements contained in the agreement made and entered into between yourselves and us in regard to that property known as the Platt Building, described as lot 1 in Park Block 2 in the City of Portland, Multnomah County, Oregon, and sixty days having expired subsequent to such notice and such neglect, failure and default having continued we hereby terminate your lease and re-enter into and upon the leased premises and the whole thereof and repossess the same.

"We are writing you this letter to give you formal notice of our re-possession of this property and request at this time that you deliver over to our agents, Metzger-Parker Company, the possession of this Building and property together with the keys, records, and such other information as will facilitate the transfer of the management of this property."

Three days after such second notice, on July 28, 1932, the Durkheimer Investment Company instituted forcible entry and detainer proceedings in the circuit court against Harrison G. Platt and Robert Treat Platt, co-partners, as the Platt building, to oust them from the actual possession of the premises described. Summons was served and plaintiffs seek in this suit to enjoin such proceedings.

About May 21, 1932, the Platts informed the lessor that they could not pay the cash ground rental provided for in the lease and could not pay the delinquent taxes. The bondholders had knowledge that the taxes were not paid and that the cash ground rental for the month of May, 1932, was not paid, but they refused to pay anything to prevent a default from being declared. The delinquent taxes, according to the letter of Mr. Platt on May 1, 1932, were approximately $34,000, and bonded street liens in excess of another $1,000. On May 21, in response to a telephone conversation with Mr. Sylvan

Durkheimer, one of the officers of the lessor, Robert Treat Platt wrote the lessor in part as follows:

"When we paid the rental stipulated in the ninety-nine year lease for the month of April, in the sum of $1,400, we went the absolute limit as to the period of time within which it was possible to pay the rental at that figure, under present conditions, and keep the enterprise afloat."

In the negotiations for a new arrangement, the following is a part of the proposal the lessor made on May 21, 1932: The cash ground rental to be paid as provided for in the lease; the lessor to loan the lessee $650 per month without interest for sixty months, or a total of $39,000.

On cross-examination Mr. Robert Treat Platt, referring to his letter of May 21, above quoted, testified:

"Q. And keep the enterprise afloat, did you mean that?

"A. That was absolutely true.

"Q. In other words, it was impossible?

"A. The rent was breaking the back of the enterprise.

"Q. It was impossible for the plaintiffs Platt to further longer pay that rent, that was true wasn't it?

"A. That is what it says."

Mr. Durkheimer was informed by the lessees that they could not accept the proposals made by the Durkheimer Investment Company. Robert Treat Platt admits that he knew what the tax delinquency was; that the cash rental for the month of May, 1932, would not be paid, and that the lessees were in fact wholly unable to carry out their obligations under the lease. The trustee for the bondholders knew of what the defaults consisted; that the bondholders refused to make good

any of the defaults and that there were no funds in his possession and none ever came into his possession with which to make good any of the defaults. Having this information, the landlord gave notice, as required by the lease in the form set out above.

BEAN, J. Plaintiffs' contentions are that the defendant, Durkheimer Investment Company, terminated said second lease at a time when said defendant was without right to do so and since such termination was wrongful, the Platts had the right to accept the termination and thereby create a mutual rescission of said second lease, and by virtue of such mutual rescission plaintiffs were entitled to be placed in status quo and to recover from the defendant Durkheimer Investment Company (a) the sum of $75,000 paid at the time of the cancellation of the old lease and the execution of the new lease in 1925, because of a total failure of consideration for such payment; (b) the value of the Platt building as of July, 1932; (c) all sums paid as taxes, city assessments, and insurance premiums under the second lease; (d) all sums paid as rentals under the second lease; together with interest on said sums, defendant being entitled to offset against said sums the reasonable value of the use and occupation of the premises from July 1, 1925, to July 29, 1932; that any other result would unjustly enrich defendant at the expense of the Platts and, to the extent of the $75,000 and the value of the building, at the expense of the bondholders.

■ Plaintiffs' first assignment of error is that the court erred in finding and holding that the lessor, Durkheimer Investment Company, was entitled to terminate the tenancy existing under the second lease of May 7, 1925. The contention of plaintiffs that the

termination of the lease was wrongful at the time it was attempted for the reason that defendant had not served sufficient notice upon plaintiffs is not well taken. The letter of the lessor to the lessees, dated May 23, 1932, notified them of the violation of the lease and of the delinquency in the payment of taxes, which were a part of the rent, and the rent, constituting such violation. It was not incumbent upon defendant to inform the plaintiffs what they should do to cure the default. The provisions as to what was required of the lessees to do and perform are plainly delineated in the lease itself, when sixty days had expired after giving the first notice, and on July 25, 1932, the defendant, in conformity with the requirements of paragraph 11 of the second lease, served upon the lessees personally the letter above quoted, which gave them formal notice of their repossession of the property and requested that they deliver over to defendant's agents the possession of the building and property. The notices fully complied with the requirements of the lease and with the law.

■ A covenant to pay rent is a continuing one to which the doctrine of waiver does not apply. The lessor of real property will not be estopped to claim the right of possession of the premises for nonpayment of rent simply because he permits defaults to be made and to continue for a time as to such payments: *Francis Bros. v. Schallberger,* 137 Or. 529, 536 (3 P. (2d) 530, 83 A. L. R. 108); Jones, Landlord & Tenant, §§ 499, 500; 1 Underhill, Landlord & Tenant, p. 649.

■ In the present case there was no waiver as to delinquent taxes. The landlord continuously demanded that they be paid. The lessor simply was willing to extend financial aid to the lessees to enable the latter to make good the default under conditions which the

lessees failed to accept or were unable to perform. The lessees were at all times wholly unable to pay the taxes and they did not change their position because of any alleged waiver of the landlord, while the latter continually demanded that they be paid. Waiver is the intentional relinquishment of a known right. Where there is not the intention to waive, there is no waiver, unless the conduct of the alleged waiver is such as to mislead the waivee to his prejudice. Waiver involves both knowledge and intention: *Mitchell v. Hughes,* 80 Or. 574, 580 (157 P. 965); *Johnson v. Feskens,* 146 Or. 657 (31 P. (2d) 667); 1 Underhill, Landlord & Tenant, p. 649.

Paragraph 13 of the lease provides that ''no waiver of a breach of any of the covenants, terms, provisions or conditions of this lease shall be construed as a waiver of any other than continuing or future breach of the same, or any other covenant, agreement, term, condition or provision of this lease''.

■■ When the Platts informed the lessor that they were unable and could not pay the ground rent of $1,400 per month, they abandoned the lease and their rights thereunder and no notice to them was necessary. The law does not require the performance of idle ceremonies: *Anderson v. Hurlbert,* 109 Or. 284, 296 (219 P. 1092). The law does not require the doing of a vain or useless act, nor does the failure to do such an act constitute a waiver of legal rights, or defeat a right otherwise conditioned on such act: *Clarno v. Grayson,* 30 Or. 111, 126 (46 P. 426); *Eldriedge v. Hoefer,* 52 Or. 241, 256 (93 P. 246, 94 P. 563, 96 P. 1105); *Livesley v. Krebs Hop Co.,* 57 Or. 352, 367 (97 P. 718, 107 P. 460, 112 P. 1); *Whitney Co. v. Smith,* 63 Or. 187, 190 (126 P. 1000); *Southern Pacific Co. v. Siemens,* 77 Or. 62, 68 (150 P. 290).

By the declaration of the Platts that they could not pay the rent or the taxes, the lessees not only abandoned the contract and waived the right to notice but they enabled the defendant to exercise its then ripened right of forfeiture, for to require a notice under such abandonment would be mere idle ceremony: *Epplett v. Empire Inv. Co.,* 99 Or. 533, 543 (194 P. 461, 700); *Mitchell v. Hughes,* 80 Or. 574, 584 (157 P. 965); *Kemmerer v. Title & Trust Co.,* 90 Or. 137, 146 (175 P. 865).

It is admitted that the Platts failed to pay the taxes for 1929, 1930 and 1931, which were a part of the rentals, and permitted those taxes to become delinquent and interest and penalties to accrue thereon. It is claimed, however, by plaintiffs, that the lessor was fully aware of the nonpayment of taxes and at no time ever intimated, much less warned the lessees, that the lease would be terminated unless the taxes were paid. We do not think that the record so indicates. Conceding that there was a duty on the part of the lessor to intimate or warn the lessees that the lease would be terminated unless it was complied with, on April 1, 1930, the Durkheimer Investment Company informed the Platts with regard to the 1928 taxes that they must be given immediate attention and satisfactory evidence of payment tendered and that thereafter during the term of the lease the taxes must be paid before they became delinquent and the lessor furnished in the regular course with duplicate receipts of payment. On March 10, 1931, the lessor informed the lessees with regard to the 1929 taxes, which had become delinquent, as follows:

"Please be advised that this is strictly contrary to your leasehold agreement, and must be promptly taken care of.

"Please advise us promptly of your program to take care of this delinquency, with specific dates."

On March 25, 1931, the lessor again wrote the Platts:

"your failure to pay these taxes before they become delinquent is strictly contrary to the terms of your leasehold. Neither yourselves, as lessees, nor ourselves, as lessor, can permit this situation to continue * * * we must definitely go on record that we cannot accede to your request to permit this to continue 'as is' unless you give us a specific date in the immediate future that we may know when the item will be taken care of, * * * we must be insistent that the item be given *prompt* attention and not permitted to repeat itself in the future."

It appears that the Durkheimer Investment Company continued in their demand that the taxes be paid, and the testimony indicates that the lessee understood at all times that the Durkheimer Investment Company was insisting upon the strict compliance with the lease.

■ It is claimed from the letter of January 14, 1932, in which defendant made the following statement:

"We cannot and will not permit the monthly rental to enter the delinquency class too. We must be insistent that the January remittance be deliverd to us by return mail, in order that we may waive the forfeiture which has already occurred. In the future monthly rental payments must be made within the legal time.

"It is our intention that in this matter you should be guided strictly by the terms of our contract and we shall so hold you in order to avoid a possibility of a delinquency of the monthly rental."

that the lessor elected to keep the second lease in full force and effect and waive the default of the payment of taxes as a consideration for forfeiting the tenancy. This letter was written when a contract of December 1, 1931, was in effect by which the Durkheimer Investment Company was to give the Platts financial assistance in the amount of $400 per month, provided the latter made a like contribution for the purpose of pay-

ing the delinquent taxes. This contract contains the provision:

"Nothing herein is intended to, or shall be construed to, in any way alter, modify or change the provisions of said lease, or the right of forfeiture thereunder if the rent provided for therein is not paid according to the provisions thereof."

This contract was breached by the Platts, who totally failed to carry out their obligations thereunder. The contract was abrogated on May 12, 1932.

■ It is claimed by the Platts that because in January, 1932, and April, 1932, the lessor accepted cash monthly payments after they became due under the terms of the lease, this constituted a waiver of the prompt payment of future rent in accordance with the lease. There is no merit in this contention. In the case of *Francis v. Schallberger,* supra, at page 536, the court said:

"Nor is there any merit in plaintiff's contention that, because Denney was lenient with Von Allmen in permitting him to increase his indebtedness from month to month, it operated as a waiver of the right to declare a forfeiture. The covenant to pay rent was a continuing one to which the doctrine of waiver does not apply. As said by Jones in his work on Landlord and Tenant, section 499:

'That lessors are indulgent and accommodating, allowing a default to continue and the amount of rent due to increase steadily, simply failing to put the tenant out, cannot be regarded as proof of their election to waive the right to declare a forfeiture and take possession, as provided for in the lease. The lessor of real property will not be estopped to claim the right to possession of the premises for nonpayment of rent simply because he permits default to be made and to continue as to such payments.' "

Section 5-209, Oregon Code 1930, provides as follows:

"The failure of a tenant to pay the rent reserved by the terms of his lease for the period of ten days (unless a different period be stipulated in the lease) after the same becomes due and payable, shall operate to terminate his tenancy, and no notice to quit or pay said rent shall be required to render the holding of said tenant thereafter wrongful; provided, however, if the landlord shall, after such default in payment of rent, accept payment thereof, such acceptance shall operate to reinstate such lease for the full period fixed by its terms, subject to be defeated or terminated by subsequent defaults in payment of rent." See *Clanton v. Oregon Kelp Ore Co.,* 135 Or. 321, 331 (296 P. 30).

Plaintiffs on this point cite *Massey v. Becker,* 90 Or. 461 (176 P. 425). That case was an action for the repayment of funds paid by a vendee on a contract for the purchase of land, which was wrongfully rescinded. The decision does not indicate, as we read it, that a vendor and vendee stand in the relation of landlord and tenant. The same may be said of *Frink v. Thomas,* 20 Or. 265 (25 P. 717, 12 L. R. A. 239), cited by plaintiffs. Oregon has no moratorium statute with regard to leases.

In *Couch v. Scandinavian-American Bank,* 103 Or. 48 (197 P. 284, 202 P. 558, 203 P. 890), the lease, instead of making the erection of a building a part of the rental and vesting title in the landlord, contained a specific provision that the lessee at the termination of the lease should remove all buildings and improvements and restore the premises to their previous condition. The tenant defaulted and the lease was terminated by the landlord, who obtained a judgment upon the bond given by the lessee in the amount of $6,500 to cover the cost of removing the structure, and thereafter brought suit

to obtain title to the building by having title quieted. The court failed to sanction this inequitable conduct. In regard to the position of the mortgagee, the court, at page 58, records the following language:

"In the case at bar, the lessee's title failed. The mortgagee had no better title than the lessee; 27 Cyc. 1041. * * *

"When the Scandinavian-American Bank took a mortgage on this property, it took it subject to all restrictions placed by law upon the Portland Ice Hippodrome, the tenant and mortgagor. The Bank could acquire no rights greater than or superior to those of its mortgagor; * * *

"The mortgagee of the leasehold interest takes it subject to all of the conditions and covenants of the lease, and a failure to pay the rent and keep the taxes paid was equally a default in the Scandinavian-American Bank as in the Portland Ice Hippodrome. * * *

"The Scandinavian-American Bank should have protected itself against the forfeiture of its security. It had a right to pay the rent and taxes so as to prevent the forfeiture of the lease." See 35 C. J. 1003, § 114.

The circuit court correctly held that the Durkheimer Investment Company was entitled to terminate the tenancy existing under the second lease of May 7, 1925.

Error is predicated upon the finding that the lessor, Durkheimer Investment Company, properly terminated the tenancy. Plaintiffs contend that a landlord seeking to take advantage of the right of forfeiture set forth in a lease must conform strictly to the procedure required for such termination. Citing *Johnson v. Feskens,* supra, and other cases; sections 5-222 and 5-226, Oregon Code 1930. However we might look upon the unfortunate circumstances and conditions prevailing during the depression which warrant sympathy for those who lose on account thereof, yet the plain contract

made with the expectation of profit or bright prospects for profit, or otherwise, does not warrant a court in making a new contract for the parties, and we think the lease was terminated strictly in accordance with the terms of the second lease.

■ Section 5-209, Oregon Code 1930, plainly indicates that the time for notice of default may be prescribed by the lease. According to paragraph 11 of the second lease, if the lessees failed to perform the covenants, promises or agreements, and such neglect, failure or default shall continue for a period of sixty days after written notice thereof shall have been given to the lessees, then the lessor may at any time after the expiration of the sixty-day period after such notice, and while such neglect or failure or default continues, terminate this lease. This clearly indicates that a notice should be given, after the default in this case as to the rents (not considering the taxes) which was May 2, 1932, and could not be given according to the terms of the lease before there was a default in such payment of rent. In other words, plaintiffs, referring to section 5-226, Oregon Code 1930, contend that the notice should have been given prior to the date the rent was due. We do not think that the lessees were entitled to notice in accordance with both the provisions of the lease and the statute. The provisions of the lease provide for a longer time of notice than the statute.

■ It was perfectly competent for the parties to stipulate in regard to the time for default to continue. The notice of May 23, 1932, forwarded by the lessor to the lessees was sufficient to inform the plaintiffs of the delinquency in the payment of taxes and rent, in violation of the lease, and giving notice to the lessees to quit and deliver to the secretary of defendant the possession of the premises after sixty days, was a sufficient notice

under the terms of the lease. The default was claimed on account of nonpayment of taxes and rent. As the default continued at the expiration of the sixty days, the lessor was warranted in the service of the notice of July 25, 1932, that the lease was thereby terminated and the lessees were to deliver the possession of the premises to the lessor. Notice of termination of a lease is not strictly construed. It is sufficient if intent is fairly shown: 16 R. C. L. 1112-1113. The plaintiffs and also the bondholders had actual prior knowledge of the default, both as to the taxes and cash rental. The defaults continued throughout a sixty-day period, not because of lack of knowledge of the details but because they were, and alleged themselves to be, wholly unable to make good the default. The notice of May 23, 1932, was not considered or construed by the lessor, the lessees, the bondholders or their trustee as an unconditional forfeiture of the lease. All the parties understood that the lessees and the bondholders could, if they desired, make good the defaults within the sixty-day period specified in the lease.

The bringing of an action, or a summary proceeding for possession, does not constitute an eviction: *Lanyon Zinc Co. v. Burtiss,* 72 Kans. 441 (83 P. 989); *Grattan v. Tierney,* 226 App. Div. 811 (234 N. Y. S. 399). There is no actual eviction unless there is a wrongful entry on the premises by the landlord: *McCarty & Allison v. Hudsons,* 24 Wend. (N. Y.) 291. One who is himself guilty of breach, or who has abandoned the contract by repudiation, cannot rescind upon breach by the other party: *Armsby v. Grays Harbor Commercial Co.,* 62 Or. 173 (123 P. 32). The plaintiffs could not rescind and remain in possession, collecting rents and profits: *Thrift v. Laird,* 115 Or. 489, 492 (237 P. 689); *Mascall v. Erikson,* 131 Or. 509, 515 (283 P. 2);

*Union Savings & Loan Ass'n v. Getty,* 135 Or. 565, 569 (296 P. 878).

The case of *Johnson v. Feskens,* supra, cited by plaintiffs, involved a contract of purchase of real estate. It was held that in the absence of fraud or improper practices equity cannot afford any relief against forfeiture, and that forfeitures are regarded by courts as a harsh way of terminating contracts, and when a party insists upon a forfeiture he must establish his right by clear and convincing proof. Mr. Chief Justice RAND records the following language on page 661 of that report:

"The right to declare a forfeiture is derived from the stipulations of the parties and if parties under no disabilities choose to contract for a forfeiture a court of equity can afford no relief against the forfeiture in the absence of some fraud or improper practice upon the part of the person seeking to impose the forfeiture." Citing 2 Warvelle on Vendors (2d Ed.) § 807.

Plaintiffs also cite *Henderson v. Carbondale Coal & Coke Co.,* 140 U. S. 25 (11 S. Ct. 691, 35 L. Ed. 332). In that case a forfeiture was denied for the reason that there was no proof that the notice and demand was in fact served upon the receiver of the lessee, and the notice did not describe the leases sought to be forfeited either as to the lessor or lessee. As to the rule of law which applies to notices, see *Fox v. Jolly* [1916] 1 App. Cas. 1.

The lease in the present case merely provides that the lessor shall give the lessees notice. This the defendant did and that the lease contemplated that the notices should be sent by mail is apparent from section 14 of the lease providing:

"Until written notice of change shall have been given, the postoffice address of the lessor shall be Man-

chester Building, 85 1/2 Fifth Street, Portland, Oregon, and of the lessees, Platt Building, 127 Park Street, Portland, Oregon.''

The notices were duly received.

Plaintiffs cite *Pedro v. Vey,* 150 Or. 415, 420 (39 P. (2d) 963, 46 P. (2d) 582). There the lease could not be terminated without giving sixty days notice to the lessee within which to comply with the terms of the lease. The lessor took possession, disposed of much of the property and then gave the notice prescribed by the lease. This was not a compliance with the lease. The case differs widely from the case in hand.

■ The law in this state with regard to wrongful eviction is that it must in fact deprive the tenant of free enjoyment of the premises. If it does so, it is unnecessary that the deprivation be permanent: *Hotel Marion v. Waters,* 77 Or. 426 (150 P. 865); *McCarty & Allison v. Hudsons,* supra.

■ There was never any actual eviction of the Platts. The most that they can assert is that they were constructively evicted by the service of the notices of May 23 and July 25, and the filing of a forcible entry and detainer complaint. The Durkheimer Investment Company's notice to quit, not followed by immediate surrender by the Platts, did not amount to an eviction. See Note, 20 A. L. R. 1370; *Peery v. Fletcher,* 93 Or. 43 (182 P. 143); *Goode v. Duke,* 131 Or. 488 (283 P. 34). In *Peery v. Fletcher,* at page 60, the court said:

''There cannot be a constructive eviction without a surrender of possession and it would be unjust and unconscionable to permit the tenant to remain in possession and then escape the payment of rent by pleading a state of facts which, though conferring a right to abandon, had been unaccompanied by the exercise of that right. 16 R. C. L. Sec. 457, p. 949.''

In *Thrift v. Laird,* supra, page 492, the court said:

"The law is well settled that a vendee in an executory contract of sale cannot remain in possession under the contract and at the same time claim a rescission of the contract."

As we view it the Platts did not in fact rescind and had no right to rescind.

Plaintiffs assert that a landlord cannot invoke forfeiture for default in the terms of the lease by a tenant, where default is caused by unprecedented economic conditions; and cite *Home Building & Loan Ass'n v. Blaisdell,* 290 U. S. 398 (54 S. Ct. 231, 78 L. Ed. 413, 88 A. L. R. 1481), in which case there was involved the statute of Minnesota, declaring a moratorium for a time as to contracts. They cite *Teachers' Retirement Fund Ass'n v. Pirie,* 150 Or. 435 (46 P. (2d) 105). The question involved in that case was the confirmation of a sale of real estate upon a mortgage foreclosure in which it was asserted that the sale was for much less than the value of the real estate. The sale was not confirmed, requiring a second sheriff's sale. There was no violation of any contract. There was no reasonable chance for the Teachers' Fund to lose a cent of principal or interest in the proceedings. The cases referred to differ from the case in hand.

■ Impossibility of performing the terms that is not due to the nature of the performance, but wholly to the inability of the individual promisor, neither prevents the formation of a contract nor discharges a duty created by a contract: Restatement of the Law of Contracts, 845.

■ The rule excusing nonperformance of a contract because of individual inability to perform would practically nullify contracts. There is no proposition on the

part of plaintiffs to pay the rent reserved in the lease. They practically demand that the rent be reduced and changed, which would be making a new contract which the court is not authorized to make.

The third assignment of error is that the court erred in finding and holding that the plaintiffs were not entitled to recover from the defendant the $75,000 payment, the value of the Platt building, and other expenditures, less a reasonable charge for the use and occupation of the leased premises. This assignment of plaintiffs is founded upon the proposition, as stated by them, that: "Where a lease is wrongfully terminated by the landlord and the tenant accepts such termination—constituting a mutual rescission—the tenant must be placed in status quo."

We have already held, and now hold, that the lease was not wrongfully terminated by the lessor. This practically disposes of the assignment. The $75,000 was paid in the cancellation of the old lease for the execution of the longer term lease. As it appears, the main consideration was the obtaining of a long term lease. As to the building, the provision of the first lease, under which it was constructed and which we have quoted in the first part of this memorandum, plainly provides that the lessees jointly and severally covenant and agree that at the expiration of said term or upon any other determination thereof, if any, in pursuance of the conditions of the agreement, they will "quit and deliver up the said leased premises and all erections to or upon the same to the lessor, peaceably, quietly and in as good condition and order as the same now are, or may be put in (reasonable use and wearing thereof excepted)". There is no good reason suggested why this covenant is not effective. Moreover, there was a building on the lot when it was first leased,

and under the law, in the absence of an agreement to the contrary, any improvement of such building or any building erected in its stead on the lot would be part of the real estate and belong to the owner of the lot.

Plaintiffs claim that by the cancellation of the lease according to its terms the defendant will be unjustly enriched in a large sum of money. The defendant counters with the statement that under the 1925 lease the Platts received over $369,000 in rents from their sub-tenants and spent $225,700 in operating expenses, including taxes and ground rent, leaving the net sum of $143,000, and under both leases the Platts received in excess of $1,000,000 in rent from their subtenants. Applying the same proportion of operating expenses to revenue in the old lease, as occurred in the new lease, they made an operating profit of approximately $220,-000. We very much regret that the profits that the Platts made, while renting the building during good times, was not continued.

The notice specified was given to the Title & Trust Company on May 23, 1932. That company, by a letter dated May 25, 1932, acknowledged receipt of the notice. The bondholders, as well as the Platts themselves, had full notice of the condition and ample opportunity to correct it. They did not do so because they could not raise the money.

We do not see that a discussion of the losses will avail any benefit to any of the parties. In all the correspondence the lessees do not indicate that they were able to pay the rent and taxes or intended to do so in conformity with the covenants of the lease.

The decree of the circuit court is right and is affirmed.

CAMPBELL, C. J., and BAILEY, J., not sitting.

Costs disallowed February 9, 1937

ORDER ON COST BILL
(64 P. (2d) 834)

BEAN, C. J. The defendant having filed a cost bill herein and plaintiffs having filed a motion for an order disallowing defendant's costs, defendant filed a memorandum in opposition thereto.

■ The court deems further consideration of the matter of costs is appropriate, and in view of the fact that it seems, in the interests of both plaintiffs and defendant, the matter involved in this suit should be finally settled, under all the facts and circumstances of this suit it is equitable and fair that each party should pay their own costs. It is hereby ordered that no costs be allowed to either party in this suit and that each party pay their own costs and disbursements.

CAMPBELL and BAILEY, JJ., not sitting.