Argued October 29, 1958, affirmed April 1, 1959

# PRINS *v.* VAN DER VLUGT ET UX

337 P. 2d 787

*Martin P. Gallagher* of Ontario argued the cause and filed a brief for appellant.

*Roy Kilpatrick* of Canyon City argued the cause and filed a brief for respondents.

Before PERRY,[*] Chief Justice, WARNER, McALLISTER,[**] SLOAN and O'CONNELL, Justices.

O'CONNELL, J.

This is a suit in equity brought by the plaintiff lessee against the lessors to set aside a written lease which the plaintiff claims is unconscionable, harsh and oppressive. The plaintiff leased the premises which are in John Day, Grant County, for the purpose of operating a physiotherapy clinic. After about a year and a half she vacated the premises and eventually the defendants took possession in accordance with the termination provisions contained in the lease. The alleged hardship to plaintiff resulting from the termination of the lease arises out of the fact that the plaintiff had constructed a building upon the leasehold premises at a cost of $14,000 and that her interest in the building would be forfeited if the relief requested is not granted.

The written lease contained a clause providing that the building was to be used by the lessee in carrying on physiotherapy and as her personal residence and for no other purpose. The lease also contained a covenant against assignment by the lessee. It is contended that these restrictions on the lessee's interest were inserted in the lease as a result of duress by the defendants. The plaintiff alleges that as a result of defendants' conduct and other factors there were not sufficient physical therapy patients to enable her to

---

[*] Chief Justice when case was argued.
[**] Chief Justice when this decision was rendered.

make a livelihood by using the premises as limited in the lease; that it was for this reason that she vacated the premises, and that if the restrictions on assignment and use are enforced the defendants will be unjustly enriched. She further alleges that a fiduciary and confidential relationship existed between her and the defendants; that as a result of this relationship she was induced by the defendants to construct the building upon the premises and enter into the lease in question upon the representation by the defendants that her interests would be protected in the event that it was not feasible to continue the use of the premises for the purposes specified in the lease; and, that by enforcing the express terms of the lease and by retaking possession of the leasehold premises the defendants have violated this confidential and fiduciary relation and that if they are permitted to retain the building they will be unjustly enriched.

The plaintiff seeks a decree permitting her to remove the building constructed by her, or to recover the reasonable value of it upon payment of such damages as defendants may have suffered. The lower court dismissed the plaintiff's complaint and the plaintiff appeals.

The lease is for a term of twenty years beginning on January 1, 1952. The lessee agreed to pay 5% of the gross receipts earned in carrying on the practice of physical therapy, payable at the end of each month during the term of the lease. There was no provision for minimum rental. The lease recited that the lessee had begun construction of a building on the leasehold premises and the lessee covenanted to complete it. It provided that upon the expiration or termination of the lease the premises were to be delivered up to the lessors. The clause restricting les-

see's use was phrased as follows: "Said building is to be used by the Lessee in carrying on and conducting physical therapy, and for no other purpose without the written consent of the lessors, excepting only that lessee shall be privileged to reside on said premises."

The lease contained a nonassignment clause which read as follows: "Said lessee will not assign, transfer, pledge, hypothecate, surrender, or otherwise encumber or dispose of this lease or the estate created in this lease, or any interest in any portion of the same, or permit any other person or persons, company, or corporation to occupy the premises without the written consent of the lessors being first obtained in writing." The lessee further agreed: "That this lease is personal to said lessee, and her interests, or any part thereof, cannot be sold, assigned, transferred, seized or taken by operation of law, or under or by virtue of any execution or other process, attachment, or proceeding instituted against the lessee, or under or by virtue of any bankruptcy or insolvency proceeding had in regard to the lessee, or any other manner, except as above mentioned."

The lease reserved the lessors a right of entry "* * * if the lessee shall be in arrears in the payment of rent for a period of 10 days, or if said lessee shall fail or neglect to do, or perform, or observe any of the covenants contained herein on her part to be kept and performed * * *."

The lease was executed under the following circumstances. The defendants, husband and wife, are medical doctors. They own and operate a hospital or clinic in John Day, Oregon. The plaintiff is a physical therapist. The parties met for the first time in 1942 when the plaintiff, as a part of her duties

as an employee of the Crippled Children's Society, went to Prairie City, Oregon where the defendants were engaged in the general practice of medicine. During 1942 and 1943 the plaintiff saw the defendants several times in connection with her work for the society. It appears that the relationship which developed on these visits was little more than a friendly professional acquaintanceship.

Plaintiff did not have any further contact with the defendants from August 1943 until 1951 when she got in touch with them by letter for the purpose of determining whether it would be feasible to establish a physiotherapy practice in John Day. At that time she had her own practice in Seattle, Washington, but because of her son's ill health she wished to move to a drier climate. The defendants indicated their interest in having the plaintiff move to John Day. She visited John Day in the spring of 1951 and again a few months later; on each occasion for only a few days. It was sometime during these visits that the parties entered into negotiations for a lease of defendants' property. The formal written lease which plaintiff now seeks to set aside was not signed by the lessee until June, 1952. However, a draft of a lease prepared by the defendants' attorney was prepared and submitted to the plaintiff's attorney sometime before November 7, 1951.

On October 18, 1951, prior to the time the written lease was finally executed, the plaintiff entered into a contract with William Zickler, a building contractor in John Day, for the construction of the building which was completed in March, 1952. It is plaintiff's position that she constructed the building before obtaining a written lease because she relied upon the defendants' oral promise that the written lease would contain a

provision for the protection of her interests in the event of her death or inability to continue to practice her profession, or if it became infeasible to continue using the premises as a physiotherapy clinic. She contends that the defendants represented to her that there was a wide and substantial demand for physical therapy services in eastern Oregon; that they intended to make additions to their hospital building and staff and to develop a general medical center for the treatment of illnesses and injuries resulting from industrial accidents and that they desired to have as an adjunct to the hospital a physiotherapy clinic to round out the services of the hospital. The plaintiff alleges that because of the defendants' manifestation of friendliness and willingness to act in the plaintiff's interest and because of their superior knowledge with respect to the opportunities for the practice of physiotherapy she was induced to proceed with the construction of the building in question though no lease had been signed.

She then charges, in effect, that after she had proceeded so far in the construction of the building that it would have been very costly for her to retreat from that enterprise, the defendants took advantage of her necessitous circumstances and through "business compulsion" forced her to accept a lease which did not protect her in the event that it became necessary for her to give up the premises. She asserts that when she tried to secure the inclusion of a clause which would protect her under such circumstances, the defendants assured her that she would not suffer by its omission from the lease, stating that there must be "mutual trust" in such matters.

There is no doubt that although the plaintiff's business was good initially, it soon fell off to a point

which made it unprofitable for her to continue the operation of the building for the restricted purpose stated in the lease. But the cause of this decline in her practice is not clear. The plaintiff asserts that prior to entering into the lease the defendants promised to enlarge their hospital, increase their medical staff and direct all of their patients needing physical therapy to the plaintiff. Aside from plaintiff's testimony, the evidence to establish that such promises were made, or, if made, were violated is not in the record. It is possible that the defendants discouraged their patients and others from seeking the plaintiff's services, for the purpose of making her occupancy of the leasehold unprofitable. But there was no evidence to prove such conduct and we are not entitled to speculate that this was the cause of plaintiff's unfortunate business experience. Plaintiff herself testified that some of the doctors in John Day and in Prairie City objected—"* * * because I was on that property; they said they didn't want to send any business there * * *." Past this, plaintiff was unable to explain why her business fell off. If we were to indulge in speculation it would only be fair to take into consideration the defendants' explanation for the decline in plaintiff's business. As shown by her records, her gross income increased steadily through July and August of 1952, and thereafter went into a sharp decline. The following is a summary of her income during the period in question:

"1952 January ............................................ nothing
February ................................................ $ 15.00
March ..................................................... 417.00
April ....................................................... 437.00
May ........................................................ 513.00
June ....................................................... 413.00
July ....................................................... 748.00

| | |
|---|---|
| August | $669.00 |
| September | 370.00 |
| October | 276.00 |
| November | 223.00 |
| December | 152.00 |
| 1953 January | 246.00 |
| February | 374.00 |
| March | 233.00 |
| April | 221.00 |
| May | 124.00 |
| June | nothing" |

■ In October, 1952 the plaintiff was married in Reno, Nevada. She was divorced in June, 1953 and moved to Boise, Idaho in July, 1953 to practice her profession. The decline in business started one month prior to her marriage, and it is possible that this affair of the heart took time and interest away from the operation of the business. However, there is no substantial evidence establishing the causative connection. But looking at all of the evidence relating to the reasons for the plaintiff's loss of business neither can we say that it resulted from the defendants' conduct.

Another of the allegations of the complaint is that the plaintiff was induced to follow the defendants' advice in establishing a physiotherapy practice in John Day in reliance upon the defendants' superior knowledge of the opportunity for the establishment of a successful practice in John Day. However, the record reveals that the plaintiff made her own investigation of the opportunities for the practice of her profession in eastern Oregon and it further shows that she had an understanding (perhaps even superior to that of the defendants) of the factors which should be considered in determining whether an area would support a

physiotherapy practice. The following testimony makes this clear.

"* * * * *

Q Do you have any formula in your profession generally, for figuring out how many people it takes to support a physio-therapist?

A Yes. You would need one new patient a day.

Q I was more interested in how many people in your area,—territory.

A That could support a physio-therapist?

Q Yes.

A Yes, I can tell you that. In the United States there is one physio-therapist for every 22,000. In Europe it is one for every 2,200. In—generally speaking—Africa it is one for every 40,000; and you figure that if 10,000 people live in a county that they would even support three physio-therapists, as far as the population is concerned. The industry, too—in an industrial area—like in logging—there are very many accidents, and more orthopedic cases, more than there would be if there were all offices, in the insurance business for instance, which would not be considered a hazardous occupation."

The plaintiff also sought the advice of another doctor in the area as to the advisability of setting up her practice in eastern Oregon and "he thought it was a wonderful idea" according to the plaintiff's own testimony. It appears to us that the plaintiff selected the city of John Day as the place to practice her profession upon the basis of her own evaluation of the opportunity which the region afforded.

She alleges in her complaint that upon the completion of the building she requested the defendants to furnish her with a memorandum of agreement setting out her relationship with the defendants including provisions to protect her investment in the

building and that thereupon the defendants presented her with a written lease. The lease referred to is the lease finally entered into by the parties after considerable negotiation. This would make it appear that the first negotiations with respect to the plaintiff's right to assign the lease occurred after the building had been erected. But these negotiations started much earlier and we think that it is important to trace them in order to determine whether there is evidence from which we might infer that the plaintiff was induced by the defendants to proceed with the construction of the building before she protected herself by a written lease.

It has been noted that the contract for the construction of the building was let on October 18, 1951. Construction was started sometime in November, 1951. A letter written to the plaintiff by her attorney, whose office was in Portland, dated November 7, 1951 recites that it was accompanied by a preliminary draft of a lease. The letter also states that the lease was submitted to plaintiff's attorney by the defendants' attorney who also practiced in Portland, and suggested certain modifications in the lease including a clause permitting the lessee to reside on the premises and "some appropriate provision to protect your rights in the event that you desire to dispose of your business during the term of the lease." The building was not completed until March, 1952. It is apparent then, that prior to the completion of the building the plaintiff had before her a written statement of the terms of the lease as drawn by defendants' attorney. We do not have evidence of the exact date upon which construction of the building began but it was sometime in November, 1951 and so it is clear that the construction could not have proceeded very far when the

plaintiff received the letter from her attorney which was mailed on November 7th. By that letter she received the advice of her attorney with respect to the very matter which she contends was left to mutual trust at the defendants' insistence, and this was at a time when the construction of the building was not very far along (as noted above the building was not completed until March, 1952) and as far as we know the opportunity to withdraw without substantial loss may still have been available to her. However, she contends that the defendants agreed to the modifications suggested by her attorney. The evidence on this point is clouded.

The plaintiff first testified that on November 22, 1951 she presented to the defendant, Gerold G. van der Vlugt, a lease prepared by her attorney and requested the defendant to sign it; that he refused to do so and said that he would draw up one of his own. The lease which plaintiff referred to contained the same covenant restricting the use of the premises as that contained in the lease finally executed. The covenant on assignment, however, differed from the final lease. It provided that the lessee could assign "to any responsible third person, persons or corporation who shall assume each and every duty, obligation and liability of this lease." The final lease prohibited assignment without lessors' consent. Later she testified that she did not have this lease with her at the conference on November 22, 1951 but that she did have the letter referred to earlier, in which her attorney suggested certain modifications of the lease he had received from the defendants' attorney. She pointed out that the defendant, Gerold van der Vlugt, had written on the margin of the letter, "OK Jerry" opposite the suggested modifications that the lessee be permitted to

reside on the premises and that the lessors would not engage in physical therapy practice. The third suggested modification for "some appropriate provision to protect your rights in the event that you desire to dispose of your business during the term of the lease" was followed by the notation in defendants' handwriting, "under same provision as lease." This could have referred to the lease which defendants' attorney prepared or to the lease which plaintiff's attorney had prepared and which, according to the plaintiff's final testimony, the defendant had not seen at that time. The plaintiff attempted to explain the reference as follows:

"A In the lease was then going to be that I could sublet it to a doctor, or make apartments out of it, or something like that. By that is meant I would have to pay five percent of the income from the building, whether I rented it or made apartments out of it, or if I practiced physio-therapy I would have to pay five percent; and I agreed that that would be all right, that I had to do that. That was meant by this provision of the lease, for the five percent."

This explanation of the notation seems strained. It seems more reasonable to interpret the notation as a rejection of plaintiff's demand for the modification requested and an insistence by the defendant that the restrictions in the lease as drafted by his attorney should be retained. If the defendant had approved of the suggested modification on the use of the building it seems strange that the lease drafted by plaintiff's attorney immediately after the November conference would not have more clearly expressed the privilege which the plaintiff requested. But that lease retained the limitation on the use of the premises for physical therapy purposes only, except for the privilege of lessee to reside on the premises. As noted earlier, this draft of the lease permitted assignment by

lessee without the lessors' consent to persons who would assume the lessee's obligations under the lease.

It is to be remembered that there was in existence at the time of the conference a draft of a lease prepared by defendants' attorney. This lease may have been before the parties at the November 22nd conference. On cross-examination when asked if she had brought this draft of the lease with her on November 22nd she replied, "I might have had it, but I didn't sign it and I didn't ask him to sign it either, if I had that." We do not think that the plaintiff's evidence is sufficient to establish that the defendant promised to permit the use of the premises as the plaintiff contends.

From some of plaintiff's testimony it would appear that the negotiations for the drafting of a lease did not begin until after plaintiff occupied the building. She testified as follows:

"What time we talked about the lease? We talked about the lease every possible time, you know, that I had a chance to get together with him since I had moved there in '52, on and off, and he finally said he would draw up a lease for me, and when he did draw up the lease for me to sign; and I went to talk to him—it was in May—and I said well, there wasn't any of the provisions made in that lease that we had previously talked about and that we had agreed upon, and he said to me, 'Well, there has to be some mutual trust. I don't want you to make any'—what do you call it—'any cafeteria or anything like that out of the building, but you can always rent it to a doctor, or make apartments out of it.' I said, 'Well, let us put it in the lease.' He says, 'Well, there has to be some mutual trust; this lease is all right.' And I thought, well, I had better sign that lease, it would be better than not having a lease at all."

The lease she referred to in her testimony was the final lease signed by both parties in June, 1952.

■ After a painstaking examination of the record in this case, we reluctantly conclude that the plaintiff has not established the existence of a fiduciary or confidential relation between herself and the defendants, either before or after the construction of the building on the leasehold, and therefore we cannot grant to the plaintiff relief from forfeiture on the ground that the defendants breached a duty to the plaintiff arising out of such a relationship.

> "A confidential relation exists between two persons when one has gained the confidence of the other and purports to act or advise with the other's interest in mind * * * *. * * * a transaction between them will not be set aside * * * unless in fact [one] placed confidence in the other and the other abused the confidence placed in him." Restatement of Restitution, § 166.

■ Consequently, unless the plaintiff can establish some other basis for equitable relief such as fraud or duress she must accept the legal consequences of entering into an unfavorable bargain which was binding upon her. If we remove from the transaction the alleged inequitable conduct of the defendants, it assumes the form not uncommonly entered into in leasing property for commercial purposes; the lessee agreeing to erect a structure on the premises which is to become the absolute property of the lessor upon the expiration or termination of the lease.

■ If a lease is lawfully terminated prior to the expiration of the term the lessee forfeits his interest in the addition made to the property, in the absence of circumstances justifying equitable relief from forfeiture. *Title & Trust Co. v. Durkheimer Co.,* 155 Or

427, 63 P2d 909, 64 P2d 834, 109 ALR 1279 (1937);
*Rinaldi v. Goller,* 48 Cal2d 276, 309 P2d 451; *State ex
rel. Hover v. Braxton W. Campbell Co.,* 114 NE2d 613
(Ohio Com Pl, 1953) cf. 6 ALR2d 323, 346; Tiffany,
Landlord & Tenant, § 242 (d).

The plaintiff asks us to apply the doctrine of
"business compulsion" on the ground that she was
coerced into making the lease as a result of business
necessity. The specific facts which plaintiff relies
upon as constituting the coercion in this case are not
clearly identified. It is argued by counsel that "the
circumstances which brought about the compulsion for
the appellant were acts and inducements of the re-
spondents in encouraging her to place the building
on their land." But, as we have already indicated,
there was not sufficient evidence of disparity in the
bargaining power of the parties to establish the al-
leged compulsion. The plaintiff has not shown "some
misplaced reliance on the opposite party's good faith,
some misleading partial disclosure, or some extreme
inequality of the parties in knowledge, experience, or
economic resources." Dawson, Economic Duress, 45
Mich L Rev, 251, 281 (1947).

As the facts appear from the record, the parties
dealt at arm's length, each represented by an attorney
who was bargaining for his client's advantage. For all
we know the plaintiff may have decided that the pros-
pects for a physiotherapy practice in eastern Oregon
were so favorable that she was willing to accept a
lease which strictly limited her right to use the prem-
ises. The defendants' insistence on a clause restrict-
ing the use of the premises was not necessarily an
unreasonable position for them to take. A use on the
leased premises alien to their hospital on adjoining

land could very well harm the defendants' business. In fact, they may have regarded continued operation of a physiotherapy clinic essential to the success of the hospital business. There is enough in the record to raise this possibility above the level of speculation.

The business risks incident to the leasing of the premises were not all on the plaintiff's side of the transaction. The defendants bargained away the use of their lot for twenty years at a rental which could have been nominal for the entire period of the lease, since no minimum rent was reserved. In the meantime, any plans for the expansion of their hospital facilities into which the structure on the leasehold did not fit would have to be modified accordingly.

■ The principle which governs the case at bar is found in *Title & Trust Co. v. Durkheimer Co.*, 155 Or 427, 63 P2d 909, 64 P2d 834, 109 ALR 1279 (1937). In that case the lessee constructed an office building on the leasehold premises at a cost of approximately $100,000 pursuant to the terms of the lease. Because of depressed economic conditions the lessee became unable to pay the rent reserved in the lease. Relying upon the default clause in the lease the lessor terminated the lease. The lessee argued that the lessor could not invoke forfeiture for default where it was the result of unprecedented economic conditions. The court said:

"Impossibility of performing the terms that is not due to the nature of the performance, but wholly to the inability of the individual promisor, neither prevents the formation of a contract nor discharges a duty created by a contract: Restatement of the Law of Contracts, 845.

"The rule excusing nonperformance of a contract because of individual inability to perform would practically nullify contracts. There is no

proposition on the part of plaintiffs to pay the rent reserved in the lease. They practically demand that the rent be reduced and changed, which would be making a new contract which the court is not authorized to make." *Title & Trust Co. v. Durkheimer Co.,* supra at p 451, 452.

In this connection the court also said:

"* * * However we might look upon the unfortunate circumstances and conditions prevailing during the depression which warrant sympathy for those who lose on account thereof, yet the plain contract made with the expectation of profit or bright prospects for profit, or otherwise, does not warrant a court in making a new contract for the parties, and we think the lease was terminated strictly in accordance with the terms of the second lease." *Title & Trust Co. v. Durkheimer Co.,* supra at p 446, 447.

In that case it was urged, as it is here, that the cancellation of the lease according to its terms would result in the unjust enrichment of the lessor. In answering this contention the court pointed out that the lessee, prior to the onset of difficult economic conditions, had collected substantial rents from his sub-lessees. The plaintiff in the case at bar considers this fact a basis for distinguishing the two cases. However, we regard the *Title & Trust Co.* case as standing for the proposition that a lease will be enforced in accordance with its terms even though the lessee may suffer losses which benefit the lessor. As the court said in that case, at page 453, "We do not see that a discussion of the losses will avail any benefit to any of the parties."

The position taken by the court in *Title & Trust Co. v. Durkheimer Co.* in holding that the lessor is entitled to improvements made by the lessee even

though the lease is terminated prior to the term specified in the lease is found in numerous cases. Cases are collected in LRA 1918 A 835 and 6 ALR 2nd 323.

The case of *Caine v. Powell*, 185 Or 322, 202 P2d 931 (1949) relied upon by plaintiff is not helpful. That case stands for the proposition that the landlord cannot terminate a lease for the tenant's breach of covenant resulting from the fraudulent conduct of the landlord. In the case at bar the plaintiff has not proved that the defendants were guilty of fraud or other inequitable conduct.

The plaintiff relies on *Clanton v. Oregon Kelp-Ore Co.*, 135 Or 321, 296 P 30 (1931), a case also involving a percentage lease without a minimum rental. The lessor attempted to terminate the lease for nonpayment of rent, alleging that the lessee had failed to comply with the terms of the lease requiring him, among other things, to mine ore from the premises out of which the rental was to be paid. The court held that there was a substantial compliance by the lessee with the terms of the lease. In that case, unlike the case at bar, the lessee was in possession of the premises, and was in the process of developing the business which gave promise of producing income out of which rent would be paid.

■ We next consider whether the lease in the case at bar was properly terminated. The plaintiff left the premises and moved to Boise, Idaho on July 4, 1953 where she resumed her occupation. No rent was paid after June, 1953. A few months later her sister moved into the building on the leasehold premises. According to the plaintiff's testimony she had her sister reside on the premises "because the neighbor had written me that somebody had tried to break into the building and so she moved in to protect it."

In April, 1954 the defendants instituted an action of forcible entry and detainer against the plaintiff's sister and obtained possession in June of that year. They have had possession since that time.

It is apparent from the plaintiff's conduct that when she left the premises she had no intention of resuming possession unless the premises could be used for some purpose other than that specified in the lease. There is no unambiguous legal term to describe the legal consequences of this type of conduct. We would describe the plaintiff's act as an abandonment were it not for the fact that the term has assumed a variety of meanings in the adjudicated cases; sometimes signifying the intention to give up a known right, sometimes merely describing the physical act of the tenant in leaving the leasehold premises; and in the latter case it is frequently used as the equivalent of surrender by operation of law and occasionally to mean a forfeiture of the lease. We think that the legal result of plaintiff's conduct is clear. Having manifested the intent to discontinue permanently her use of the premises for the purpose designated in the lease, the defendants had the option to treat the lease at an end. American Law of Property, § 3.99, p 394. The defendants manifested their intention to exercise their power of termination by serving the notice of default upon the plaintiff.

■ The lease was terminable upon still another basis. The lessee obligated herself to pay rent at the rate of 5% of the gross receipts of the business. No minimum rent was reserved. Under these circumstances we are of the opinion that the lease must be construed as including an implied covenant to continue the business. American Law of Property, § 3.41, p 257; *Lippman v. Sears Roebuck & Co.*, 44 Cal 2d 136, 280 P2d

775 (1955); *Sinclair Refining Co. v. Davis*, 47 Ga App 601, 171 SE 150 (1933); *Seggebruch v. Stosor*, 309 Ill App 385, 33 NE2d 159 (1941); see 170 ALR 1113, 38 ALR2d 1113.

Any other construction would excuse the plaintiff from the obligation to pay any rent to the defendants and would, therefore, defeat the defendants' purpose in entering into the lease. Note, 61 Harv L Rev 317, 326 (1948). The covenant having been broken, the defendants were entitled to terminate the plaintiff's interest in the leasehold in accordance with the default provisions reserved in the lease.

We regret that the plaintiff's business enterprise resulted in failure. On the basis of the evidence which is included in the record we are powerless to help her recover her loss. The decree is, therefore, affirmed.