Argued and submitted September 18, 1992, on appeal, reversed and remanded in part and otherwise affirmed; affirmed on cross-appeal December 8, 1993, reconsideration denied June 22, petition for review pending 1994

HAMPTON TREE FARMS, INC.,
*Respondent - Cross-Appellant,*

*v.*

Natalie D. JEWETT,
Personal Representative of the Estate of
William W. Jewett, Deceased,
*Third-Party Plaintiff,*
*Appellant - Cross-Respondent,*

*and*

Daniel A. ERICKSON
and Erickson Hardwood Company,
*Third-Party Plaintiffs,*
*Appellants,*

*v.*

John C. HAMPTON
and Diamond Wood Products, Inc.,
an Oregon corporation,
*Third-Party Defendants,*
*Respondents.*

(9004-02368; CA A70222)

865 P2d 420

John L. Langslet argued the cause for appellants and appellant - cross-respondent. With him on the briefs were

Julie K. Bolt and Martin, Bischoff, Templeton, Langslet & Hoffman.

Jeffrey M. Batchelor argued the cause for respondent - cross-appellant Hampton Tree Farms and respondent John Hampton. With him on the brief were David G. Hosenpud and Lane Powell Spears Lubersky.

Mary K. Vander Weele argued the cause for respondent Diamond Wood Products. With her on the brief were Stephen S. Walters and Stoel Rives Boley Jones & Grey.

Before Richardson,* Chief Judge, and De Muniz and Leeson,** Judges.

De MUNIZ, J.

---

* Richardson, C. J., *vice* Rossman, P. J.

** Leeson, J., *vice* Buttler, J., retired.

## De MUNIZ, J.

Defendants appeal from a judgment for Hampton Tree Farms, Inc. (plaintiff), to enforce a guaranty and a pledge agreement made by defendant William Jewett.[1] They contend, *inter alia*, that the trial court erred in failing to grant their motion for directed verdict on plaintiff's claim on the guaranty and in granting summary judgment to plaintiff dismissing their counterclaims. Plaintiff cross-appeals, contending that the trial court erred in failing to award it attorney fees for successfully defending against the counterclaims.

Defendant Erickson Hardwood Company (EHC) owned two Oregon plants, an alder lumber and pallet manufacturing plant in Garibaldi, and a "cut-up plant" and dry kilns in Grand Ronde. Daniel Erickson was EHC's president and sole shareholder. Jewett was an officer of the corporation, had loaned it substantial sums of money and held options to purchase its stock. Between 1984 and 1987, EHC installed an automatic pallet assembly machine and a new mill at the Garibaldi plant.

Plaintiff was EHC's major supplier of alder logs, which were essential to EHC's pallet industry. Beginning in February, 1986, Jewett obtained, for plaintiff's benefit, an irrevocable letter of credit as security for logs sold by plaintiff to EHC. The letter required the issuing bank to make immediate payment to plaintiff of up to $100,000 if EHC's log account was more than 11 days overdue. EHC's account was more than 11 days overdue most of the time, but plaintiff did not draw on the letter of credit. Jewett extended and increased the letter of credit several times.

In the fall of 1987, EHC owed plaintiff approximately $300,000. Plaintiff was unwilling to continue supplying logs without further assurances that the debt would be paid. In October, 1987, "to induce [plaintiff] to continue to sell logs," Erickson and Jewett jointly and severally gave plaintiff a guaranty for

"the prompt payment to [plaintiff] at maturity of every note, check, loan, advance, contract for payment of logs and all

---

[1] Jewett is deceased. His personal representative was substituted in accordance with ORAP 8.05 and ORCP 34.

other claims or indebtedness for which [EHC] is now liable or shall become liable to [plaintiff] in the future * * *."

The guaranty was "continuing." It was to "remain in full force until revoked." Jewett and Erickson agreed that, in the event of EHC's default, they would "pay on demand all sums due and to become due." As a part of the guaranty, Erickson and Jewett executed a security agreement and UCC financing statement.

Shortly after EHC began to operate its new mill at Garibaldi, a drought interrupted its supply of alder logs, and the mill closed. In December, 1987, EHC filed a petition for reorganization under Chapter 11 of the Bankruptcy Code. Plaintiff continued to supply EHC with logs, and EHC's debt grew to $810,000. In February, 1988, Jewett replaced the letter of credit with a $250,000 certificate of deposit, issued in Jewett's and plaintiff's names jointly, subject to the terms of a pledge agreement that gave plaintiff the sole right to redeem the certificate in the event of EHC's default. Jewett's pledge and certificate of deposit secured only pre-bankruptcy debt. In October, 1989, John Hampton, plaintiff's president, wrote a letter to Jewett expressing the intention to redeem the certificate of deposit, and in April, 1990, plaintiff filed this lawsuit.

Jewett responded to plaintiff's complaint by requesting that Erickson and EHC be joined as defendants. The trial court granted the request, and all three defendants filed counterclaims for breach of fiduciary duty, negligence, breach of contract and breach of the duty of good faith and fair dealing. They also filed third-party claims against Hampton, individually, and Diamond Wood Products, a customer of plaintiff's, in which they alleged that Hampton and Diamond had acted to destroy EHC's business and had thereby triggered Jewett's liability to plaintiff. The trial court granted summary judgment to plaintiff on defendants' counterclaims and dismissed the third-party claims.

Summary judgment is appropriate under ORCP 47 if the record on summary judgment shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In considering defendants' contention that the court erred in granting

plaintiff's motion for summary judgment on their counter-claims, we view the record in the light most favorable to defendants. *Stanfield v. Laccorarce*, 288 Or 659, 665, 607 P2d 177 (1980). The record on summary judgment consists of all exhibits and depositions submitted by the parties in support of, or in opposition to, the motion for summary judgment. That is the record we review here.

In response to plaintiff's motion for summary judgment, defendants submitted evidence that EHC filed its bankruptcy petition under Chapter 11 after Hampton promised that plaintiff would supply EHC with logs to keep EHC's mill running. From the time EHC filed for bankruptcy in December, 1987, defendants operated the Garibaldi and Grand Ronde mills under the supervision of the bankruptcy court, with protection from EHC's creditors. Plaintiff continued to sell logs to EHC on credit, and understood that a consistent log supply was essential to EHC's Chapter 11 plan. Plaintiff became EHC's only supplier, and, if it did not produce enough logs for EHC, it would purchase them and deliver them to EHC's mill. A February, 1988, order of the bankruptcy court recites that EHC, in the ordinary course of its business and at its discretion, could obtain logs from plaintiff on credit and that plaintiff would have a first priority lien on all logs, products, accounts and proceeds of the mill and retain title to all logs until they were manufactured and the lumber or pallets were sold.

The bankruptcy court confirmed EHC's reorganization plan in November, 1988. All parties contemplated that the success of the plan was contingent on plaintiff continuing to supply EHC with logs. Hampton told Jewett that he believed that EHC was a viable business; in reliance on that, Jewett increased the amount of his guaranty. After the filing of the reorganization plan, EHC and plaintiff worked together closely. Financial statements show that, in the spring of 1989, EHC's income exceeded its expenses and its debts were diminishing.

In May, 1989, Hampton called a meeting with EHC, because he was concerned about an imbalance between EHC's receivables and its inventory. Plaintiff sought additional collateral as a condition of continuing to supply logs to

EHC, and Jewett, Erickson and EHC agreed to provide plaintiff additional collateral for any debt over $600,000. Jewett assigned to plaintiff a mortgage that he had received from Erickson and his wife on two Dairy Queen restaurants. EHC increased to 60% the percentage of receivables that it would pay to plaintiff. Hampton assured defendants that plaintiff would continue to supply logs to EHC. A few days later, EHC's log debt was reduced to below $600,000.

Also at the May meeting, Hampton suggested that it was a good time to try to sell the Garibaldi mill, because he believed that it was profitable and marketable. He promised that he would tell any potential buyer that plaintiff would continue to supply the mill with logs and that he did not anticipate any shut-downs. Erickson and Jewett authorized Hampton to find a potential purchaser and to report back within 30 days.

A few weeks later, Hampton reported to Erickson that Diamond would buy the mill for $2.5 million. Because he believed that the mill would continue to be profitable and that the proposed sale price was too low, Erickson asked Hampton not to insist on the sale. Hampton made it clear to Erickson that if he did not agree to the sale, plaintiff would stop supplying logs to EHC, which would force the closure of the mill.

In mid-June, 1989, Erickson met with a Japanese businessman who was interested both in purchasing 40 to 50 car loads of alder lumber per month from EHC and in providing financing. Erickson could do nothing without plaintiff's consent, because plaintiff was EHC's sole log supplier. Hampton refused to consider the arrangement. Hampton told Erickson: "You don't understand, Diamond is going to get all the logs. Don't even try to find financing. The mill is sold and that's it."

Without advising Erickson, Hampton and Tom Schmit, plaintiff's financial officer, met with Diamond on July 10, 1989, to negotiate the sale of EHC's assets. Hampton proposed a sale price of $1.5 million in cash and the release of Erickson and Jewett from their guaranties. Hampton proposed an additional $1 million payment "down stream" to plaintiff, Erickson and Jewett from a limited partnership to

be created with Diamond. Hampton wrote a memorandum of understanding that included the details of the proposed terms. He never consulted Erickson regarding the terms of sale or provided him with a copy of the memorandum.

Hampton and Schmit held a second meeting with Diamond on July 18, 1989, again without defendants' knowledge. Diamond had indicated to Hampton that it anticipated the collapse of EHC and contemplated purchasing its assets at liquidation. It offered to purchase the Garibaldi mill for $700,000. Hampton told Diamond that plaintiff expected to continue to supply logs to EHC, that there was no imminent risk that EHC would shut down and that Diamond should not hope to acquire EHC in liquidation.

Hampton continued to assure EHC that a sale to Diamond would go through. Because plaintiff controlled EHC's log supply, EHC, Jewett and Erickson were forced to agree to sell the mill and other assets and to drop their negotiations with the Japanese concern. In July, 1989, defendants signed an earnest money agreement whereby Diamond offered to pay, and defendants accepted, $1,400,000 for the mills at Garibaldi and Grand Ronde, with a further payment of $900,000 to be made at a future date.

Thereafter, without explanation, plaintiff stopped shipping logs to EHC. By August 1, 1989, EHC had no logs and shut down. On August 11, 1989, Diamond called Erickson and told him that it would not close on the sale. It offered, instead, to purchase the Garibaldi mill only for $700,000, if EHC and Erickson would sign a release of all claims they might have against Diamond. Erickson met with Schmit, who informed him that Hampton and Diamond were scheduled to meet the following Monday and that everything would be "OK." Despite Hampton's alleged efforts to negotiate better terms, Diamond would not budge. Defendants refused to sell EHC's assets to Diamond on its proposed terms, because they believed that the price was too low and they did not want to release Diamond from liability for any claims they might have.

In September, 1989, Erickson met with EHC's bankruptcy attorney and its trial attorney in this case to discuss the possibility of suing plaintiff and Diamond. In October,

1989, EHC's creditors declared EHC to be in default, and, on October 24, 1989, EHC's Chapter 11 reorganization was converted to a Chapter 7 liquidation. EHC's bankruptcy attorney represented to the bankruptcy court that EHC had no assets to administer. In November, 1989, he filed a motion to dismiss the Chapter 7 proceeding, representing again that EHC had no assets to administer, because all of EHC's assets had been pledged as collateral to the Small Business Administration (SBA), and the assets were worth less than the amount owing to SBA. The bankruptcy court dismissed the Chapter 7 proceeding without prejudice. SBA held a marshall's sale of EHC's assets, and Diamond acquired both mills for $210,000.

On November 22, 1989, EHC's attorneys recommended to Erickson and EHC that EHC file a claim against plaintiff for breach of contract and breach of fiduciary duty. In April, 1990, plaintiff filed this action against Jewett. Defendants subsequently filed their counterclaims.

On the basis of the record before it, the trial court granted summary judgment to plaintiff on defendants' counterclaims on the ground that EHC was judicially and equitably estopped from asserting the claims because, before securing a dismissal of its Chapter 7 bankruptcy, EHC had represented to the bankruptcy court that it had no assets, knowing that it intended to assert claims against plaintiff. The court ruled that the counterclaims of Jewett and Erickson were derivative and that they were likewise barred.

■■ The doctrine of judicial estoppel bars a party from asserting a position that is in conflict with a position successfully asserted in an earlier judicial proceeding. *See Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F2d 414 (3d Cir), *cert den* 488 US 967 (1988). Although no Oregon court has purported to formulate definitive terms for the application of the doctrine, there are certain elements that courts have consistently treated as significant. The doctrine is intended "to protect the integrity of the judicial process by preventing a party from taking a position inconsistent with one successfully and unequivocally asserted by the same party in a prior proceeding." *Reynolds v. C.I.R.*, 861 F2d 469, 472 (6th Cir 1988). Judicial estoppel operates "to protect the judiciary, as an institution, from the perversion of judicial

machinery," *Edwards v. Aetna Life Ins. Co.*, 690 F2d 595, 599 (6th Cir 1982), and "to prevent the use of 'intentional self-contradiction * * * as a means of obtaining unfair advantage in a forum provided for suitors seeking justice.' " *Allen v. Zurich Ins. Co.*, 667 F2d 1162, 1167 (4th Cir 1982), *quoting Scarano v. Central R. Co. of New Jersey*, 203 F2d 510, 513 (3d Cir 1953); *see also LaChance v. McKown*, 649 SW2d 658, 660 (Tex App 1983). In Oregon, the party raising judicial estoppel as an affirmative defense has the burden to show that it relied to its detriment on the position taken by the other party in the earlier proceeding. *Marshall v. Korpa*, 118 Or App 144, 148, 846 P2d 445, *rev den* 316 Or 528 (1993). The doctrine has been applied in cases similar to this one to hold that a debtor who invokes the protection of the bankruptcy court and purports to disclose all of its assets, including claims that it might assert in subsequent litigation, is precluded from later asserting a claim that existed at the time of the bankruptcy but was not disclosed. *Oneida Motor Freight, Inc. v. United Jersey Bank, supra*; *Caplener v. U.S. National Bank*, 317 Or 506, 857 P2d 830 (1993).

In *Caplener*, the defendant bank was the plaintiffs' main creditor. The plaintiffs did not dispute the bank's claim in bankruptcy court and even admitted to it. Before the plaintiffs had filed for bankruptcy, they had filed a claim against the bank for breach of an agreement to lend money. They had disclosed that claim in the bankruptcy court as a contingent asset, valued at $444,516. After the plaintiffs' debts had been discharged, they amended their complaint to allege against the bank new claims and damages of over $11 million.

In considering whether judicial estoppel barred the augmented claims, the Supreme Court phrased the issues as: (1) "whether the disclosure of an action seeking $451,000 in damages is sufficient to put Bank (as well as other creditors, the bankruptcy trustee, and the bankruptcy court) on notice of a potential claim of over $11 million based on the same underlying facts," *i.e.*, whether the plaintiffs had, in fact, "disclosed" their claims; and (2) whether the position of the plaintiffs in the bankruptcy proceeding was "fundamentally at odds" with their current position. 317 Or at 520. The Supreme Court held that the plaintiffs' failure to dispute the

bank's claim in bankruptcy, their stipulation to the validity of the bank's claim in order to obtain post-petition financing and their failure to disclose the full amount of their claim against the bank were "fundamentally at odds" with their subsequent position in state court asserting a claim against the bank for $11 million. The court ruled that the plaintiffs were estopped to assert claims in state court for damages in excess of $451,000.

■ There are significant differences between *Caplener* and this case. In *Caplener*, the plaintiffs' state law claims had been filed before the bankruptcy proceeding, on the basis of facts known to the plaintiffs at that time and on the basis of the same alleged conduct that had brought the plaintiffs into bankruptcy. The bank had made a claim in the bankruptcy estate; the plaintiffs had never disputed the bank's claim and, in fact, had stipulated to its validity. Yet the plaintiffs' augmented claims were based on the same transaction that gave rise to the debt that formed the basis for the bank's claim. The bank had provided interim financing during the bankruptcy, unaware that the plaintiffs' claim against it would be augmented to allege damages of over $11 million. Finally, and most significantly, in *Caplener*, the plaintiffs' debts were *discharged* in bankruptcy.

As evidenced by the Supreme Court's treatment of *Caplener*, the court applies the doctrine of judicial estoppel conservatively, and not without some reluctance. We are persuaded that the circumstances here do not justify application of the doctrine. The events that form the basis for EHC's claims against plaintiff did not occur until August, 1989, almost two years after EHC had filed for bankruptcy reorganization under Chapter 11 and after the reorganization plan had been approved. It is not clear that the claims would have been considered assets of the estate. *See In Re Leach*, 101 BR 710 (Bkrtcy ED Okla 1989); *In re Magellanes*, 96 BR 253 (9th Cir BAP 1980).

Additionally, and most significantly, the court's acceptance of EHC's representations that there were no assets to administer, even if gained by subterfuge, resulted only in the dismissal of the bankruptcy proceeding *without prejudice*. We are hard pressed to see how EHC improved its position as a result of the court's dismissal of the bankruptcy

proceeding. That is an essential component of the defensive application of judicial estoppel. It is apparent that, by leaving the protective cloak of bankruptcy, EHC only increased its exposure to its creditors. We conclude that the trial court erred in granting summary judgment to plaintiff on the basis of the doctrine of judicial estoppel.[2]

■　　Plaintiff contends that each of EHC's counterclaims is barred by *res judicata, i.e.*, claim preclusion, because they could have been litigated in the bankruptcy proceeding but were not, and that the trial court's granting of summary judgment should be sustained on that basis. We need not consider whether EHC's counterclaims could have been filed in the bankruptcy court or whether they would have been barred by claim preclusion if the bankruptcy proceeding had culminated in a final judgment on the merits, because we conclude that the bankruptcy court's order dismissing the bankruptcy proceeding without prejudice is not a final determination on the merits, in the sense required for application of claim preclusion. *Drews v. EBI Companies*, 310 Or 134, 795 P2d 531 (1990).

■　　Plaintiff contends that the trial court's granting of summary judgment should, nonetheless, be affirmed with respect to EHC's counterclaim for breach of contract. EHC alleged that plaintiff breached an oral agreement to sell EHC's Garibaldi mill and to continue to supply logs sufficient to keep the mill fully operational. Plaintiff contends that the alleged agreement is not sufficiently definite to be enforced, that it fails for lack of consideration and that it does not comply with the Statute of Frauds. We agree with plaintiff that the alleged oral agreement to sell the mill is too indefinite to be enforced. *See Booras v. Uyeda*, 295 Or 181, 193, 666 P2d 791 (1985). Beyond the general promise by Hampton to sell the mill on the best possible terms, the alleged agreement has no terms. The evidence does not provide a sufficient basis on which plaintiff's liability for breach of that agreement, if any, can be fixed. Accordingly, we conclude that the alleged agreement is unenforceable and that the court did not err in granting summary judgment to plaintiff with respect to the claim that plaintiff breached an agreement to sell EHC's mill.

---

[2] We reject, without discussion, plaintiff's contention that equitable estoppel bars EHC from bringing its counterclaims.

■ With respect to the alleged agreement to supply logs, we conclude that there is evidence from which the terms of the agreement and the liability of the parties can be sufficiently determined. There is evidence in the record on summary judgment from which a jury could find that the parties had agreed that plaintiff would provide EHC a steady and reliable supply of logs, in consideration for which EHC increased plaintiff's share of EHC's receivables to 60% and provided additional security in the form of a third mortgage on a Dairy Queen.[3] The indefinite duration of the agreement is not fatal to its enforcement, so long as there is evidence from which the term can be defined. *See* ORS 72.2040(3); *Adair Homes, Inc. v. Jarrell*, 59 Or App 80, 84, 650 P2d 180 (1982). There is evidence from which the jury could find that the alleged log supply agreement was intended to continue until EHC had cleared away its indebtedness and the mill had become profitable. There is evidence from which the jury could find that plaintiff breached its agreement to supply logs when, pending sale of the mills to Diamond, plaintiff stopped delivering logs, forcing the closure of the Garibaldi mill. The trial court erred in granting summary judgment to plaintiff on EHC's claim of breach of an agreement to supply logs.

■ Plaintiff contends that defendant's counterclaim for breach of the duty of good faith and fair dealing falls with the claim for breach of contract because it is dependent on it. No argument is made with respect to whether the record supports that claim. In the light of our determination that there is evidence from which it could be found that plaintiff had, and breached, an agreement to supply logs to EHC, the trial court's granting of summary judgment for plaintiff on EHC's claim of breach of the duty of good faith and fair dealing is also reversed.

■ Defendants counterclaimed for breach of fiduciary duty, alleging that plaintiff and Hampton "undertook to sell the Erickson Hardwood mill on behalf of and for the benefit of, and therefore as an agent and fiduciary of [defendants]" and that plaintiff breached that fiduciary duty by forcing a sale of the mill on terms unacceptable to defendants and by refusing to supply EHC with logs when it appeared that the

---

[3] We will not inquire into the adequacy of the consideration. *Biersdorf v. Putnam et al.*, 181 Or 522, 182 P2d 992 (1947).

sale of the mill would not go through. Plaintiff contends that we should affirm the trial court's granting of its motion for summary judgment with respect to the counterclaim for breach of fiduciary duty, because plaintiff was not a fiduciary with respect to defendants and neither owed nor breached the duties of loyalty, fair dealing and full disclosure, to which a fiduciary is held. *See Delaney v. Georgia-Pacific Corp.*, 278 Or 305, 310, 564 P2d 277 (1977). Defendants argue that plaintiff's dominance over EHC, due to its control of its finances and log supply, Hampton's insistence that defendants acquiesce in the sale of the mill and his assumption of full responsibility to negotiate the sale agreement, created a relationship of control and dependency such that plaintiff should be held accountable to defendants as a fiduciary.

In their pre-bankruptcy dealings, plaintiff and EHC had a business relationship that does not ordinarily carry with it duties beyond those contractually assumed. In the bankruptcy, plaintiff was one of EHC's primary creditors, and the terms of that relationship were defined largely by the February, 1988, order of the bankruptcy court. That order authorized EHC to purchase lumber from plaintiff on credit and gave plaintiff a priority interest and other lien rights in EHC's logs, products and accounts acquired or created after the commencement of the bankruptcy. It required EHC to: deposit into a special account all funds received from the sale of EHC's products, of which plaintiff was entitled to a percentage as payment for logs; prepare a quarterly operating cash flow budget for plaintiff's approval; furnish plaintiff with a monthly financial report; provide plaintiff and the other creditors with a weekly schedule of sales and accounts receivable; and obtain approval from plaintiff and the other creditors before purchasing more than $2,000 worth of equipment.

In the light of the parties' business and debtor-creditor relationship, the question is whether plaintiff's role could ever have become that of a fiduciary. In *Georgetown Realty v. The Home Ins. Co.*, 313 Or 97, 111, 831 P2d 7 (1992), the Supreme Court held that circumstances between contracting parties might give rise to a relationship beyond the parties' contractual dealings. It has been held that, "in the rare circumstance" where a creditor exercises such control

over the decision-making processes of the debtor as amounts to a domination of its will, it may be held accountable for its actions under a fiduciary standard. *Matter of Teltronic Services, Inc.*, 29 BR 139, 170 (EDNY 1983).

In *Eulrich v. Snap-On Tools Corp.*, 121 Or App 25, 36, 853 P2d 1350, *rev den* 317 Or 583 (1993), a hand tools dealer sought to hold the manufacturer of the tools responsible under a tort theory of breach of the duty of good faith and fair dealing. We held that, "[i]f the parties construct an essentially fiduciary-type dependency relationship, duties will arise from that relationship" that are independent of any contractual duties that the parties might have to each other. Here, as in *Eulrich*, there is evidence that the parties' business and debtor-creditor relationship evolved into one of dependency. By virtue of its control of the lumber supply and EHC's finances, plaintiff assumed and had complete control over EHC's operations. Hampton took responsibility for the continued viability of the Garibaldi mill, even to the extent of insisting, against EHC's will, that it be sold. Hampton enhanced plaintiff's control and EHC's dependency by excluding EHC from discussions and negotiations related to the sale of the mill. We conclude that there is evidence from which a jury could find that, by virtue of the control that plaintiff asserted and the dependency that it fostered, a special relationship existed between plaintiff and EHC that gave rise to fiduciary responsibilities and the attendant duties of loyalty, fair dealing and full disclosure. *Delany v. Georgia-Pacific Corp.*, supra; *see Strickland v. Arnold Thomas Seed*, 277 Or 165, 170, 560 P2d 597 (1977); *compare Vocu v. Eells*, 240 Or 175, 400 P2d 516 (1965). The trial court erred in granting summary judgment to plaintiff on EHC's claim of breach of fiduciary duty.

■ EHC alleged that plaintiff was negligent when, acting in the capacity of a fiduciary, it failed to exercise reasonable care to market and sell the mill and to continue to supply EHC with logs. Plaintiff contends that the trial court's ruling on summary judgment should be affirmed with respect to that claim, because the fiduciary relationship on which it is premised did not exist. In the light of our holding that there is evidence from which a jury could find that plaintiff had a special relationship with EHC that gave rise to duties beyond

those associated with the parties' business and debtor-creditor dealings, we reject the contention.

 In the light of our reversal of the trial court's rulings on summary judgment, it is necessary for us to determine whether Jewett, as an investor, and Erickson, as a shareholder, are entitled to pursue counterclaims against plaintiff independent of EHC. As the Supreme Court said in *Caplener v. U.S. National Bank, supra,* whether an individual may pursue a claim for damages due to a third party's breach of a duty owed to a corporation depends on whether the damages suffered by the individual are distinct from, rather than derivative of, the damages claimed by the corporation. 317 Or at 515. Defendants' theory, as summarized in their opening brief, is that plaintiff's conduct caused EHC's demise and that "EHC's demise triggered Jewett's liability to plaintiff, and EHC, Jewett and Dan Erickson sustained damages." We have examined the pleadings and conclude that the damages alleged by Jewett and Erickson flow from their financial interest in EHC. *See* 317 Or at 515. Accordingly, their counterclaims are derivative of, rather than distinct from, the claims of EHC, and they have no separate legally cognizable claims for breach of fiduciary duty, negligence or breach of contract. The trial court did not err in granting summary judgment to plaintiff on Jewett's and Erickson's counterclaims.

 Defendants assign error to the trial court's dismissal of the third-party claims against Hampton and Diamond. ORCP 22C(1) permits a third-party action against "a person not a party to the action who is or may be liable to the third party plaintiff for all or part of the plaintiff's claim against the third party plaintiff * * *." We have held that a third-party claim must in some way be dependent on the outcome of the main claim and that the third-party defendant's liability must be secondary or derivative. *Fisher v. Bowman,* 97 Or App 357, 360, 776 P2d 575, *rev den* 308 Or 500 (1989), *quoting United States v. One 1977 Mercedes Benz,* 708 F2d 444 (9th Cir 1983), *cert den sub nom Webb v. United States,* 464 US 1071, 104 S Ct 981 (1984). The third-party claim has the effect of shifting all or part of the third-party plaintiff's liability to its defendant. An independent claim by a defendant, even though arising out of the same transaction or

occurrence as the main claim, is not a sufficient third-party claim. In this case, defendants' third-party claims against Diamond for breach of the agreement to purchase the Garibaldi mill and breach of the duty of good faith and fair dealing are not dependent on the outcome of plaintiff's claims on the pledge and guaranty, and would not have the effect of shifting liability on the guaranty and pledge from defendants to Diamond. Accordingly, Diamond is not a proper third-party defendant.

█ Similarly, defendants' third-party claims against Hampton for breach of fiduciary duty, negligence, breach of contract and breach of the duty of good faith and fair dealing do not depend on the outcome of the main claims against Jewett for breach of the guaranty and pledge agreement. Hampton's liability to defendants would not result in Hampton being liable to plaintiff for all or part of Jewett's obligations on the guaranty and pledge; therefore, Hampton is not properly characterized as a third-party defendant. We also agree with the trial court that, although defendants' third-party claims may arise out of the same operative facts as the main claims, they are independent, in the sense that their outcome is not necessarily dependent on the outcome of the main claims against Jewett.

Defendants contend that joinder of the third-party defendants is, nonetheless, appropriate under ORCP 28, which provides, in part, that

"[a]ll persons may be joined in one action as defendants if there is asserted against them jointly, severally, or in the alternative, any right to relief in respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all defendants will arise in the action."

The federal counterpart to ORCP 28, FRCP 20, has been held to permit impleader of non-parties as defendants to cross-claims or counterclaims. *Baltimore & Ohio R. Co. v. Central Ry. Serv.*, 636 F Supp 782 (ED Pa 1986). Judicial economy and trial convenience are key considerations in determining whether joinder is appropriate under ORCP 28. *See United Mine Workers of America v. Gibbs*, 383 US 715, 724, 86 S Ct 1130, 16 L Ed 2d 218 (1966). Theoretically, under the federal court's interpretation of the federal counterpart to ORCP 28,

Diamond and Hampton could be joined as defendants to the counterclaims. However, as a decision related to the administration of the business of the court, whether to permit joinder of a party under ORCP 28 is within the discretion of the trial court. *See Newman v. Tualatin Development Co. Inc.*, 287 Or 47, 597 P2d 800 (1979); *Gilbert Pacific Corp. v. Dept. of Transportation*, 110 Or App 171, 822 P2d 729 (1991), *rev den* 313 Or 210 (1992). We will not disturb it in the absence of an abuse of discretion. Although joinder of Hampton and Diamond might have been "permissible" under ORCP 28, in the light of the trial court's ruling dismissing defendants' counterclaims, the court did not abuse its discretion in refusing to permit Diamond and Hampton to be joined as defendants to those counterclaims. In the light of our holdings reinstating the counterclaims, on remand, the court may reconsider its ruling.

We have considered and reject defendants' contention that the trial court abused its discretion when, subsequent to its granting of summary judgment to plaintiff on defendants' counterclaims, it refused to allow Jewett to amend his answer so as to allege the counterclaims as affirmative defenses or to grant him a continuance so that he could do so.

Immediately after the court denied defendants' motion to amend their answer, it struck from defendants' general denial affirmative allegations that the failure of EHC's bankruptcy plan was the result of plaintiff's failure to supply logs. We conclude that the court did not abuse its discretion in striking the affirmative allegations from the answer. *See* ORCP 19B. The court also excluded evidence offered to prove the stricken allegations. In the light of our reversal of the trial court's granting of summary judgment on EHC's counterclaims, we conclude that the evidence is admissible.

Defendants contend that the trial court erred in denying Jewett's motions for a directed verdict and for judgment notwithstanding the verdict on plaintiff's claim on the guaranty. We review the court's ruling to determine whether there is any evidence to support the jury's verdict on the guaranty. As the parties agree, the guaranty executed by Jewett was subject to the condition that plaintiff make prior

demand on Jewett for payment of EHC's debt. In order to have found Jewett liable on the guaranty, there must have been evidence from which the jury could find that plaintiff complied with that condition. In considering whether there is substantial evidence to support the jury's verdict, we bear in mind that the guaranty

> " 'should not receive a strict and technical interpretation but a fair, and reasonable one, according to the true import of its terms, and what may be fairly presumed to have been the intention and understanding of the parties, with a view to the furtherance of its spirit and in order to attain the object designed[.]' *Marshall-Wells Co. v. Tenney et al.*, 118 Or 373, 383, 244 P 84 (1926). (Citations omitted.)" *Bank of the Northwest v. Brattain*, 73 Or App 261, 263, 698 P2d 536 (1985).

Plaintiff contends that the following evidence supports the jury's verdict. In October, 1989, Hampton sent this letter to Jewett:

> "We understand that [EHC] will be converted to a Chapter 7 bankruptcy. [I]t is clear that there will be little, if any, [EHC] assets which may be used to satisfy [EHC's] debt to [plaintiff]. That debt is now over $900,000. We have concluded that there is little or no chance to recover any of our pre-petition open log accounts receivable. Therefore, within the next few days we will redeem the $250,000 Certificate of Deposit pledged to [plaintiff] in February, 1988."

Plaintiff contends that the jury was entitled to interpret the letter as a demand not only for enforcement of the pledge agreement and redemption of the certificate of deposit, but "that Mr. Jewett follow through on his promises," including the payment of all of EHC's indebtedness under the terms of the guaranty.

Plaintiff's lawyer sent a letter to Jewett on November 7, 1989:

> "Demand is hereby made that you give written consent * * * for redemption * * * of Certificate of Deposit No. 00638137 due February 3, 1990. * * * Sums received by Hampton Tree Farms will be applied to reduction of the * * * indebtedness owed to it by Erickson Hardwood Company, payment of which has been guaranteed by you."

Plaintiff contends that a reasonable person could conclude that that letter was a demand that Jewett honor the guaranty after first reducing EHC's debt with the proceeds of the certificate of deposit. Defendants contend that, because the letters make no express demand based on the guaranty, they cannot satisfy the condition for demand set forth in the guaranty. Although the guaranty conditions Jewett's liability on prior demand, the demand is not subject to any requirements of form or timeliness. The guaranty provides only that Jewett will pay the indebtedness "on demand." We conclude that the jury was entitled to interpret the two letters together as calling upon Jewett to satisfy his obligations for EHC's entire indebtedness under the guaranty, not just his obligation under the pledge agreement, thus fulfilling the requirement for prior demand.

The guaranty was also subject to the condition that plaintiff "exhaust" efforts to collect on the guaranty against Erickson before "resorting" to Jewett. We agree with plaintiff that, in the light of what it knew of Erickson's financial condition, it would have been a useless act for plaintiff to have first sought to collect on the guaranty from Erickson and that plaintiff was therefore excused from satisfying that condition. *Title & Trust Co. v. Durkheimer Co.*, 155 Or 427, 441, 63 P2d 909, 64 P2d 834 (1937).

The guaranty required that, before taking action against Jewett, "all of the * * * security assets have been sold and the proceeds applied to reduction of [EHC's] indebtedness." There was evidence from which the jury could find that, with the exception of two fuel tanks having a value of no more than $9,000, there were no assets available to reduce EHC's indebtedness of over $800,000 and that plaintiff was therefore excused from satisfying that condition.

■ The final assignment of error relates to the correctness of the judgment. The jury answered these questions on its verdict form:

"(2) What is the total amount that plaintiff is entitled to recover from defendant Jewett under the guaranty agreement?

"ANSWER: $250,987

"* * * * *

"(4) What is the total amount that plaintiff is entitled to recover from defendant Jewett under the pledge agreement?

"ANSWER: $250,000"

Defendant took no exception to the verdict form. After the jury returned its verdict, the court put into the record that it had

"ask[ed] a question of the presiding juror if these two were separate amounts. In other words, if they were part of the same or whether they were two amounts which total about $500,000. He said it was two separate amounts that you ruled on."

The court then polled the jury, and all twelve agreed that they intended to award two separate amounts. The trial court totaled the two amounts and entered judgment for plaintiff for $500,967. Defendants assign that ruling as error, contending that the recovery on the claim under the pledge must be offset against the recovery on the claim based on the guaranty, and that the judgment results in a double recovery.

Defendants did not object to the jury's verdict, even after learning of the jurors' intentions with respect to the two separate amounts. We conclude that defendants cannot now be heard to object to the judgment, which is consistent with the verdict and with the presiding juror's explanation to the court of the jury's intentions. *See Smith v. J. C. Penney Co.*, 269 Or 643, 655, 525 P2d 1299 (1974); *Fisher v. Howard*, 201 Or 426, 464, 271 P2d 1059 (1954).

In view of our disposition of the appeal, we do not reach plaintiff's cross-appeal, in which it contends that the trial court erred in failing to award it attorney fees for its successful defense of the counterclaims.

On appeal, reversed and remanded with respect to Erickson Hardwood Company's counterclaims and otherwise affirmed; affirmed on cross-appeal.