Argued and submitted July 22, 1998, vacated and remanded with instructions on appeal; affirmed on cross-appeal February 17, both petitions for review denied July 6, 1999 (329 Or 61)

HAMPTON TREE FARMS, INC.,
*Respondent - Cross-Appellant,*

*v.*

William W. JEWETT
and Daniel A. Erickson,
*Defendants,*

*and*

ERICKSON HARDWOOD COMPANY,
*Appellant - Cross-Respondent.*

William W. JEWETT,
Daniel A. Erickson and
Erickson Hardwood Company,
*Third-Party Plaintiffs,*

*v.*

DIAMOND WOOD PRODUCTS, INC.,
an Oregon corporation,
*Third-Party Defendant.*

(9004-02368; CA A95491)

974 P2d 738

John L. Langslet argued the cause for appellant - cross-respondent. With him on the briefs was Martin, Bischoff, Templeton, Langslet & Hoffman.

Jeffrey M. Batchelor argued the cause for respondent - cross-appellant. With him on the briefs were George L. Kirklin, David G. Hosenpud, Dian S. Rubanoff and Lane Powell Spears Lubersky.

Before Warren, Presiding Judge, and Edmonds and Armstrong, Judges.

WARREN, P. J.

## WARREN, P. J.

Erickson Hardwood Company (EHC) appeals from a judgment that the trial court entered on plaintiff Hampton Tree Farms, Inc.'s (Hampton) claims for amounts due for logs and lumber drying services and on EHC's counterclaims for breach of contract and breach of fiduciary duty. On appeal, EHC asserts that the judgment does not properly give effect to the jury's verdict. On cross-appeal, Hampton asserts that the trial court erred in not granting its motions for directed verdict on EHC's counterclaims. On the appeal, we vacate the judgment and remand for entry of a corrected judgment; we affirm on the cross-appeal.

Hampton originally filed this case to recover on defendant William Jewett's guaranty of amounts that EHC owed Hampton. EHC and Daniel Erickson (Erickson), its president and sole shareholder, joined the case as defendants, and all three defendants then filed a number of counterclaims against Hampton. The trial court granted Hampton summary judgment on those counterclaims, and the case went to trial on the claim against Jewett, resulting in a judgment in Hampton's favor. On appeal we affirmed that judgment but reversed and remanded the dismissal of EHC's counterclaims; we affirmed the dismissal of Erickson's and Jewett's counterclaims because they were derivative of the corporation's. *Hampton Tree Farms, Inc. v. Jewett*, 125 Or App 178, 865 P2d 420 (1993) (*Hampton I*).[1] The Supreme Court took review of our decision on the counterclaims, affirmed our decision and remanded the counterclaims to the trial court for further proceedings. *Hampton Tree Farms Inc. v. Jewett*, 320 Or 599, 892 P2d 683 (1995) (*Hampton II*). This appeal is from the trial on remand.

We state the facts most favorably to EHC as the party that prevailed at trial on the counterclaims.[2] Those

---

[1] Jewett died before we decided the appeal, and the case proceeded against his estate.

[2] There are no disputed facts on Hampton's claims that affect this appeal, although there are disputes about the meaning and effect of the jury's verdict on those claims.

facts are generally consistent with the statements in the previous appellate decisions. EHC is the incorporated version of a family business that operated for several decades on the northern Oregon coast, producing alder lumber and related alder products. At the relevant times, EHC operated at two locations, in Garibaldi and Grand Ronde. It sawed logs into lumber at Garibaldi, while Grand Ronde had a resaw operation and kilns for drying lumber.

Because alder normally grows in stands of mixed alder and softwoods, and because most, if not all, loggers in EHC's area log softwoods, alder logs are usually available only as a by-product of logging softwoods. Thus, EHC did not purchase standing timber but, instead, acquired its logs from lumber companies that logged softwood timber for use in their own mills. If those companies could not sell their alder to EHC or another hardwood mill, their alternative was to turn it into wood chips, a low value use of the logs. EHC's presence thus made it possible for its suppliers to maximize their income from logging. Hampton operates a softwood mill in Tillamook, which is ten miles from Garibaldi, and actively logs the nearby coast range. In the years before 1987, Hampton became EHC's primary supplier of alder logs; by the fall of that year, EHC owed Hampton approximately $500,000 for logs that EHC had purchased.

In fall 1987, EHC completed a remodeling of its mill in Garibaldi that accompanied a shift in its product mix and marketing strategy. EHC had traditionally produced alder lumber for the furniture market. In the early 1980s that market became weak, and EHC began producing pallet "shook" as well as lumber. It sold the pallet shook to other businesses that manufactured pallets for the warehouse industry. Among other advantages, pallet shook could use lower quality wood than was acceptable for furniture. After the remodeling of the Garibaldi mill, EHC was able to produce pallets from the shook that it was already producing; it may have been the only mill in the country that began with logs and ended with finished pallets.

EHC shut down the Garibaldi mill for several months in 1987 for the remodeling. In November 1987, when the modified mill was ready to begin operations, the woods

were closed because of the fire danger resulting from a drought, and there were no logs available for EHC to purchase. In addition, EHC knew that it would take some time to break into the market for finished pallets and that it would have to offer below market prices in order to do so. It owed large amounts to a number of creditors in addition to Hampton and had reached the limit of its bank loans. EHC thus did not have the resources to deal with the immediate lack of logs and the longer-term problem of establishing itself in a new market.

In an effort to find the financing that it needed, EHC asked Hampton for a loan. John Hampton, Hampton's president, refused but suggested that EHC file a Chapter 11 bankruptcy, which would protect EHC from immediate foreclosure by its other creditors. If EHC did so, Hampton would be able to sell EHC logs after the filing, acquiring a security interest in them that would be superior to that of all other creditors. Hampton officials told EHC that Hampton would then be willing to sell it logs, provided that EHC agreed to purchase its entire supply from Hampton and to give Hampton a security interest not only in the logs but also in the lumber and pallets that it produced from them. Hampton expected that it would produce enough alder to meet EHC's needs 90 percent of the time and intended to purchase logs from other sources when it could not.

Soon after this conversation, EHC followed Hampton's recommendation and filed a Chapter 11 petition. Thereafter, it obtained a bankruptcy court order allowing Hampton to sell logs to EHC and retain a first priority lien on the logs, products, accounts, and proceeds of the mill. In practice, Hampton received a percentage of every payment that EHC received for lumber or pallets. Originally it received 50 percent, but in May 1989 the percentage increased to 60 percent. In addition, Hampton closely monitored EHC's finances.

EHC's plan of reorganization provided for payments to all of EHC's creditors and contemplated that Hampton would be the sole source of EHC's logs while the plan was in effect. Although the plan permitted EHC to purchase logs elsewhere if it first gave Hampton and EHC's bank three days' notice, EHC never purchased elsewhere and never had

the possibility of finding the cash that would have permitted it to do so. Under the plan, as a practical matter, a continued supply of logs from Hampton was essential to EHC's survival. The bankruptcy court approved the plan in November 1988.

Throughout this period both John Hampton and other Hampton officials indicated, to EHC and others, that they believed that EHC was a viable business. Jewett increased his guaranty of EHC's debt based on John Hampton's assurances in that regard. In July 1988, a Hampton vice president wrote a letter "To Whom It May Concern" in which he stated that Hampton did not believe that it would experience any curtailment in delivering logs to EHC and encouraged the reader to place pallet orders with EHC. Despite a fire at the Grand Ronde plant in February 1989 that destroyed the lumber drying kilns along with $200,000 of lumber, forcing EHC to use a nearby Hampton facility to dry its lumber, EHC steadily increased its production and sales of pallets and showed significant monthly profits during much of the first half of 1989. Erickson believed that EHC was on the verge of becoming a highly profitable and valuable business.

Despite this progress, Hampton was concerned that EHC's debt for logs and lumber drying had not declined to the extent that it desired and that, in Hampton's view, Hampton was not fully secured for the entire amounts that EHC owed it. At a meeting on May 18, 1989, Hampton and EHC discussed the situation at length and reached an agreement under which Hampton would continue to provide logs, Hampton's percentage of amounts received for lumber and pallets would increase to 60 percent, EHC would reduce its debt, and Jewett would provide additional security to guaranty amounts owed in excess of $600,000.

After the parties agreed on these actions, John Hampton suggested that, because the mill[3] appeared to be profitable, it was a good time to sell it. Erickson resisted a

---

[3] Although the parties generally referred to the "mill" in the singular, they contemplated a sale of EHC's entire business, including both of its locations.

sale but ultimately agreed to allow John Hampton to find a purchaser. John Hampton agreed to tell others that the mill was profitable, that it would not be shut down because it would be worth less if it was not running, and that there were plenty of logs for it. The parties remembered the agreement somewhat differently. Erickson testified that he understood that John Hampton was authorized simply to find a potential buyer, not to negotiate the terms of a sale.[4] John Hampton testified that, when Erickson subsequently objected to what he had done, he reminded Erickson "that we had all discussed in May that it would be best to find a viable sale for the mill; and that he specifically had agreed that I should go forth and try to do that." Jewett testified, through a deposition taken before his death, that John Hampton said, either at the May meeting or later, that "this matter should be left in [his] hands because he was a pro, and he knew exactly what he was doing." Jewett agreed that John Hampton was a pro and that it should be left in his hands.

On June 2, 1989, John Hampton met with the Harrisons, the principal owners of Diamond Wood Products, Inc., which operated a hardwood mill in Eugene, to discuss the possible purchase of EHC's mills. Erickson thereafter gave Diamond a tour of the Garibaldi mill. On July 10, John Hampton again met with the Harrisons and worked out the structure of a purchase for $1.5 million, with the possibility of another $1 million from the mill's future profits. He chose the $1.5 million price because it was sufficient to pay the secured creditors; he had not appraised the mill. John Hampton dictated a memorandum of understanding that the Harrisons signed, although the memorandum expressly stated that it was not binding on Diamond. John Hampton did not consult with EHC concerning any aspect of these negotiations; he chose the terms and structure without apparent concern for its views or willingness to accept them.

After the meeting, John Hampton reported to Jewett that he had sold the mill, and Jewett passed the news on to Erickson. The next day Erickson met with John Hampton to

---

[4] The parties agree that, whatever the scope of his authority may have been, John Hampton acted as an agent of Hampton Tree Farms, Inc., in this regard.

plead with him not to carry through with the sale, in part because Erickson believed that the mill was worth at least $5 million.[5] John Hampton told Erickson that he had no choice: if he did not agree to the sale to Diamond, Hampton would cut off his log supply and force EHC out of business. Hampton had decided that a sale was in EHC's best interests, and he "warned" and "admonished" Erickson that he had to face reality and accept the sale.

John Hampton and a Hampton financial official met with the Harrisons again on July 18, at which time the Harrisons proposed changes to the memorandum to reduce the price and, possibly, to limit the purchase to only the Garibaldi mill. The Harrisons suggested that Diamond might wait until EHC failed and then purchase the assets on liquidation. John Hampton said that there was no imminent risk that EHC would shut down and that Hampton would continue to provide logs. He told the Harrisons that they should proceed as originally contemplated. John Hampton did not invite any EHC representative to this meeting or give EHC a copy of the original memorandum. At a meeting on July 21, at which EHC representatives were finally present, the Harrisons proposed buying EHC's assets for $1.4 million immediately and a possible $900,000 in the future. The sale was subject to Diamond's due diligence inspection and bankruptcy court approval. Erickson and Jewett signed an agreement with those terms because they believed that Hampton's control of EHC's log supply left them with no choice.

Shortly after this agreement, and without any explanation, Hampton began reducing the logs that it delivered to EHC, with the result that EHC had to close down on August 1 for lack of logs. Although it operated one or two shifts in the next week or so as a few loads trickled in, for all practical purposes it ceased doing business at that time. The jury could have found that Hampton's subsequent explanations for failing to continue delivering logs were incredible and that Hampton sent alder saw logs to its Tillamook mill for turning

---

[5] Erickson had also begun negotiations with Japanese lumber buyers who expressed interest in purchasing 40 to 50 carloads of alder lumber a month and who would consider providing financing to allow EHC to produce that amount. When Hampton forced the sale of the mill, those negotiations necessarily ended.

into pulp chips, a low value use of alder wood. About the same time, Diamond decided that it would purchase only the Garibaldi mill, not the Grand Ronde operation, for $700,000. Again, the jury could disbelieve the reasons that the Harrisons gave for that decision. In the middle of August, Erickson refused to release money in the joint Hampton/EHC account to Hampton, saying that he intended to use it to pay his workers. Immediately thereafter, Hampton began sending large quantities of alder logs that would normally have gone to EHC to Diamond's mill in Eugene. The shipping cost was considerably greater than if it had sent the logs to EHC.

EHC still attempted to sell the Garibaldi plant to Diamond, but the sale fell through because of Diamond's refusal to represent that it had not acted, either alone or in concert with John Hampton, to harm EHC. Soon afterwards, the bankruptcy court converted the Chapter 11 reorganization proceeding to a Chapter 7 liquidation. However, in November 1989 it dismissed the case, without prejudice and without discharging EHC from any of its debts, because there were no assets for unsecured creditors. In February 1990, Diamond bought the Garibaldi mill at a Small Business Administration auction for $210,000. It operated the mill until 1995, when it sold it to Weyerhaueser. Hampton was Diamond's primary log supplier during that time.

The issues in the trial from which this appeal arises were EHC's counterclaims against Hampton for breach of fiduciary duty, negligence, and breach of contract to supply logs[6] and Hampton's setoff[7] for the value of the logs and lumber drying services that it had supplied EHC. The jury found, in a special verdict, (1) that Hampton breached its fiduciary duty to EHC, that EHC's damages from that breach were $1 million, that EHC's negligence or fault was 30 percent of the cause of its damages, that Hampton was guilty of wanton misconduct that caused damage to EHC but that the jury did not decide to award punitive damages; (2) that Hampton was

---

[6] The breach of contract counterclaim included EHC's counterclaim for breach of the implied duty of good faith and fair dealing.

[7] Because of our decision on the other issues, we do not need to decide whether the setoff claim was also a counterclaim seeking affirmative relief.

not negligent; (3) that Hampton breached a contract to supply EHC with logs and that EHC's damages from that breach were $240,000; and (4) that EHC owed Hampton $900,000 for logs, lumber drying services, and interest to the date of the verdict.

Based on that verdict, the court entered judgment in favor of Hampton for $200,000. It did so because it determined (1) that the damages on the breach of contract counterclaim duplicated those on the breach of fiduciary duty counterclaim; (2) that it should reduce the damages on the breach of fiduciary duty counterclaim to reflect the percentage of EHC's fault, bringing the amount to $700,000; and (3) that it should not reduce the amount awarded Hampton to reflect payments that Hampton had received from other sources. Each of those decisions is the subject of an assignment of error in EHC's appeal. In its cross-appeal, Hampton assigns error to the trial court's denial of its motions for directed verdict on the breach of contract and breach of fiduciary duty counterclaims.

■ We first consider whether the damages on the breach of contract counterclaim duplicated the damages on the breach of fiduciary duty counterclaim. EHC did not distinguish between the compensatory damages that it sought on the various counterclaims. In its pleadings, in the evidence that it presented, and in its argument to the jury it sought the same amount, for the same harm, on each counterclaim. Similarly, the court did not distinguish between the counterclaims when it instructed the jury on compensatory damages. The jury, thus, received no basis for assigning some damages to one counterclaim and different damages to another.

Beyond the way in which the parties tried the case, the very nature of the counterclaims suggests that the damages that the jury awarded for breach of contract were included in the damages that it awarded for breach of fiduciary duty. The sole breach of contract that EHC alleged in its pleadings was Hampton's failure to supply logs. In the breach of fiduciary duty counterclaim EHC alleged many breaches, *including* the failure to supply logs. Because the jury concluded that Hampton had breached a contract to supply logs, it necessarily concluded that that breach was at least one of

the ways in which Hampton breached its fiduciary duties. Thus, the damages that the jury awarded on the breach of contract counterclaim must be subsumed in those that it awarded on the breach of fiduciary duty counterclaim.

EHC argues, however, that if "a special verdict permits the jury to award separate damages on separate claims, those damages must be totaled." It relies on *Kilgore v. People's Savings & Loan Assn.*, 107 Or App 743, 814 P2d 163 (1991), *rev dismissed* 313 Or 300 (1992), for that proposition. In *Kilgore,* the plaintiff stated separate claims for common-law negligence and violation of the Residential Landlord and Tenant Act. The jury awarded identical amounts for general damages and for damages for emotional suffering on each of those claims. It also awarded special damages of $2,000 on one claim and $1,800 on the other, a total of $3,800, although the parties had stipulated that special damages were $3,818. The trial court concluded that the jury had divided its total award of damages between the two claims; it could give no other explanation for the awards of special damages. 107 Or App at 753 n 10. On appeal, we affirmed the resulting judgment. We pointed out that the defendants did not request an instruction that, if the jury concluded that they were liable on both claims, an award of damages on one would preclude an award on the other, and that the defendants did not object when the jury returned its verdict. 107 Or App at 752-53.

In this case, Hampton did not request an instruction limiting the jury's ability to award separate damages on the separate counterclaims. After the jury returned its verdict, EHC asked the court to inquire whether the jury intended the damages to be cumulative; the court refused to do so. EHC also points out that the jury in the previous trial in this case returned a verdict with two separate awards of damages against Jewett and that the trial court, after asking the jury what it intended, entered judgment for the total amount. We affirmed that judgment, in part, because Jewett did not object to the verdict at the trial court on the ground that it provided a double recovery. *Hampton I,* 125 Or App at 197-98. Based on those cases, EHC argues that the trial court should have concluded that the jury intended to award separate damages on the two counterclaims. It emphasizes that the verdict form, which Hampton drafted, required the jury

to award damages on each counterclaim rather than to make a single award on all counterclaims and that the trial court refused EHC's request to ask the jury its intent in making the awards.[8]

EHC's argument would give those cases greater significance than their specific holdings justify. Each case turns in large part on its specific facts. In *Kilgore* the jury's division of the undisputed special damages between the two claims was explicable only if it had divided *all* of the damages between those two claims. In *Hampton I*, Jewett's liability on his guaranty and Hampton's right to recover the certificate of deposit that he had pledged were clearly defined separate debts, even if the amounts were potentially overlapping. In contrast, this case fits the more common situation in which a party seeks to obtain the same damages under several different legal theories; that is how EHC presented both its evidence and argument on damages. Thus, even though there may be more than one legal reason that Hampton is liable to EHC for its actions, under the evidence those actions did not harm EHC in distinct ways that caused distinct damages.[9] Because the verdicts on those two counterclaims compensate EHC for the same damages, it is entitled to judgment on only one of the them. *See, e.g., Eulrich v. Snap-On Tools*, 121 Or App 25, 42, 853 P2d 1350, *rev den* 317 Or 583 (1993).

We next discuss Hampton's first assignment of error on cross-appeal, in which it attacks the trial court's denial of its motions for directed verdict against EHC's counterclaims. We conclude that the court properly denied the motion for directed verdict on the counterclaim for breach of fiduciary duty. Because the damages awarded on that counterclaim are greater than on the counterclaim for breach of contract,

---

[8] The trial court refused to ask the jury to clarify its verdict because it incorrectly believed that appellate decisions prohibited it from doing so; as it later recognized, such an inquiry could have resolved this issue. The trial court's failure to obtain the jury's express explanation does not prevent either it or us from using the available information to determine the legal effect of the verdict.

[9] As we previously discussed, the jury could have found that the breach of contract caused fewer damages than did the breach of fiduciary duty but, if it did so, it must have found that the damages for breach of fiduciary duty included those for breach of contract.

we do not need to consider Hampton's arguments on the contract counterclaim.[10] The first question is the effect of the previous appellate decisions on this issue. In our decision in *Hampton I*, we concluded that a jury could find that Hampton had moved beyond its role as a creditor and had created a special relationship in which EHC was so dependent on it that Hampton had fiduciary duties to it. *Hampton I*, 125 Or App at 192. The Supreme Court rested its conclusion that Hampton owed a fiduciary duty to EHC on a narrower ground, that Hampton had become EHC's agent with regard to the sale of the mill:

> "There is evidence in the record from which one could infer that Hampton had consented and undertaken to act as EHC's agent to sell the mill and that EHC retained some control over Hampton in that regard. John Hampton stated in his deposition that he understood that he was 'to go out and try to find a buyer for the mill,' but that he lacked the authority to sell the mill. John Hampton did find a buyer for the mill. One reasonably could infer, based on that evidence, that John Hampton had consented to act on behalf of EHC to find a buyer for the mill and that EHC retained some element of control over the actual sale of the mill." *Hampton II*, 320 Or at 617-18.

The court also noted that there was evidence that EHC consented to have John Hampton act as its agent for the sale of the mill. *Id.*, 320 Or at 618.

Hampton argues, based on the Supreme Court's decision in *Hampton II*, that the only fiduciary duty that it assumed was limited to acting as an agent to find a potential purchaser for the mill and that, once it produced the memorandum of understanding with Diamond, Hampton's agency (and thus its fiduciary duties) terminated. Rather than violating its limited fiduciary duties, it fulfilled them, and EHC is not entitled to a recovery. EHC responds that the Supreme Court's opinion is the law of the case and establishes that

---

[10] The trial court reduced the damages for breach of fiduciary duty by the percentage of EHC's comparative fault, a reduction that would not apply to the damages for breach of contract. EHC does not argue that only the damages for breach of fiduciary duty that exceed the damages for breach of contract are subject to that reduction.

EHC was entitled to have the case submitted to a jury. The issue is somewhat more complex than EHC suggests, but we agree with much of its argument and with its conclusion.

Hampton is correct that the Supreme Court focused exclusively on its role as an agent in determining that Hampton may have had fiduciary duties to EHC. What Hampton fails to note is that the sole issue before the court was whether there was a basis for a jury to find that Hampton had a fiduciary duty. Once the court concluded that such a basis existed, it did not need to determine the scope of the duty or when it ended. The court's statements, thus, do not mean that Hampton's fiduciary duties necessarily terminated when it produced Diamond as a possible purchaser. In the same way, the court did not need to discuss our broader view of Hampton's fiduciary duties, and nothing in its opinion indicates that it either accepted or rejected that approach.

■ Hampton seems to assume that finding a buyer for a business can only mean locating an interested person and then fading into the background. That is not the only way to interpret such a task. Until someone has completed a purchase, there has not in fact been a "buyer." Thus, an agent's duties may include negotiating over terms, providing necessary data, arranging for inspection, and generally shepherding the deal through to closing. The jury could find from John Hampton's actions and from his and Jewett's testimony that his role in finding a buyer for EHC's mill involved much more the narrow view that Hampton now takes. According to Jewett, John Hampton told him to leave the sale in his hands, and Jewett agreed to do so. That testimony is consistent with John Hampton's actions.

John Hampton did not stop when he located Diamond and got its tentative agreement to terms that were designed primarily to provide payment to existing creditors and, not incidentally, provide Hampton a continuing (and solvent) market for its alder logs. When Erickson complained about the terms, John Hampton admonished him that the mill was sold. He continued to negotiate with Diamond over the terms and, in fact, was the primary negotiator throughout the process until shortly before the sale finally fell through. He used Hampton's power to force Erickson to agree

to the sale, even as the proposed terms became less favorable to it.

The jury could find that John Hampton's actions from the time that Erickson and Jewett agreed that he could find a buyer for the mill were a continuing course of conduct and that there was no point during that course of conduct at which his role as an agent for EHC ended and he resumed an arm's-length relationship with it. Rather, the jury could find, John Hampton remained EHC's agent for the purpose of selling the mill throughout the process. The facts that we have previously described in this opinion, together with our analysis in *Hampton I* of Hampton's control over EHC, are sufficient for the jury to find that Hampton had fiduciary duties to EHC at least from May 16, 1989, until the possibility of a sale to Diamond ended. They are also sufficient for it to find that Hampton breached those duties. The trial court did not err in denying Hampton's motion for directed verdict on this counterclaim. Because the damages duplicate those on the breach of contract counterclaim, we do not need to consider Hampton's second assignment of error, which involves its motion for directed verdict on that counterclaim.[11]

We return to the issues concerning the judgment that EHC raises on its appeal. We first consider its argument that the trial court should not have reduced the damages on the counterclaim for breach of fiduciary duty to reflect the jury's finding of comparative fault. EHC asserts that comparative fault does not apply because the jury expressly found that Hampton had engaged in wilful misconduct. It points out that contributory negligence was not a defense to wilful misconduct and argues that comparative fault is therefore also not a defense. We generally agree with EHC.

■ The applicable version of the comparative fault statute, ORS 18.470 (1989), provides:

> "Contributory negligence shall not bar recovery in an action by any person or the legal representative of the person to recover damages for death or injury to person or

---

[11] We also do not need to consider the continuing validity of our conclusion in *Hampton I* that Hampton's exercise of economic control over EHC also imposed fiduciary duties on it.

property if the fault attributable to the person seeking recovery was not greater than the combined fault of the person or persons against whom recovery is sought, but any damages allowed shall be diminished in the proportion to the percentage of fault attributable to the person recovering. This section is not intended to create or abolish any defense."

As the text of the statute indicates, the legislature adopted comparative fault to replace contributory negligence, which was an absolute bar to recovery. None of the relatively few cases that discuss when comparative fault is applicable decides whether it applies to situations where the defendant is liable not because of negligence, however aggravated, but because of wilful misconduct. We conclude, from the text of the statute and the cases that construe it, that comparative fault does not apply in that situation.

Before the adoption of ORS 18.470, the Supreme Court held that contributory negligence was not a defense to wanton misconduct. *Falls v. Mortensen*, 207 Or 130, 295 P2d 182 (1956); *Cook v. Kinzua Pine Mills Co.*, 207 Or 34, 42-43, 293 P2d 717 (1956). The court did not find an extended discussion necessary in *Cook*, where it first recognized the rule, contenting itself with a quotation from a hornbook. In *Falls*, it stated that an instruction based on the rule was "undoubtedly correct." 207 Or at 134. In the course of describing what constitutes wanton misconduct, it favorably quoted a case in which the Pennsylvania Supreme Court stated that it is " 'something different from negligence however gross,—different not merely in degree but in kind, and evincing a different state of mind on the part of the tortfeasor.' " *Id.* at 139, *quoting Kasanovich v. George*, 348 Pa 199, 34 A2d 523, 525 (1943).

At the same time, simple contributory negligence was a complete defense to a claim by a guest passenger, even though the passenger had to prove the driver's gross negligence in order to recover. In adhering to that position after *Cook* and *Falls*, the court noted that, in cases not covered by the guest statute, it had concluded that contributory negligence was not "a bar to wanton conduct on the part of the defendant." *Zumwalt v. Lindland*, 239 Or 26, 32, 396 P2d 26

(1964). Thus, before the adoption of ORS 18.470, simple contributory negligence was a defense to at least *some* claims based on gross negligence but not to *any* claims based on wanton misconduct, which represented an entirely different category of culpability.

*Johnson v. Tilden*, 278 Or 11, 562 P2d 1188 (1977), contains the Supreme Court's only significant discussion of the effect of ORS 18.470 when a defendant's culpable conduct is greater than simple negligence. In *Johnson*, a guest passenger case, the jury found that the plaintiff and the defendant were each 50 percent at fault. The court entered judgment for the plaintiff for half of the damages that the jury found. The defendant appealed, asserting that the comparative fault statute did not apply when the plaintiff had to prove gross negligence and that the plaintiff's contributory negligence should thus bar her recovery. The issue was whether the statute had replaced contributory negligence with comparative fault in all circumstances or had left contributory negligence in place in some cases. The court held that the statute had totally abolished contributory negligence. It did not need to decide all the cases to which comparative fault now applies.

The Supreme Court first noted that the term "fault," when given its ordinary meaning, includes driving while intoxicated or in a grossly negligent manner. 278 Or at 14. It then examined the history of the statute, including its text when originally adopted in 1971 and the legislative history of the 1975 amendment. It noted that the original version referred to an action "to recover damages for negligence," while the amended statute calls for a comparison of the plaintiff's "fault" with that of the defendant. It concluded that the legislature intended "fault" to include actions for negligence and gross negligence, "as well as any other actions based on tortious conduct, however described, in which contributory negligence is an appropriate defense." 278 Or at 16-17.

In *DeYoung v. Fallon*, 104 Or App 66, 798 P2d 1114 (1990), *rev den* 311 Or 222 (1991), the question was whether comparative fault was a defense to a claim for gross negligence in a nonguest passenger situation. After discussing *Johnson*, we concluded that comparative fault is a defense to

all claims for gross negligence. We pointed out that the legislative history that the Supreme Court described in *Johnson* showed that the original draft of the 1975 amendment to ORS 18.470 referred to "negligence or gross negligence" and that the Supreme Court concluded that the legislature intended the substitution of "fault" to encompass all actions in which contributory negligence is an appropriate defense. Under the Supreme Court's analysis, thus, all claims based on gross negligence, not just those claims arising out of the former guest passenger statute, are subject to the defense of comparative fault. 104 Or App at 71-72. In a footnote, we repeated the Supreme Court's quotation in *Sanford v. Chev. Div. Gen. Motors*, 292 Or 590, 642 P2d 624 (1982), of the Maine Supreme Judicial Court's observation that " '[n]egligence ranges from the least blameworthy type * * * up to a state where knowledge or more complete knowledge supervenes and the negligence of obstinacy, self-righteousness or reckless [*sic*] is reached.' " 292 Or at 608, *quoting Wing v. Morse*, 300 A2d 491, 500 (Me 1973).

In reaching our conclusion in *DeYoung*, we rejected the dissent's argument that the decision in *Johnson* was limited to the guest passenger context, in which contributory negligence had always been a defense. According to the dissent, the statement in *Johnson* that comparative fault applied only when contributory negligence was an appropriate defense meant that comparative fault was a defense to gross negligence in that context but not in others. The dissent also pointed out that ORS 18.470 provides that the statute "is not intended to create or abolish any defense." 104 Or App at 72-74. In response, we emphasized that the Supreme Court specifically found a clear legislative intent to extend comparative fault to actions based on gross negligence and that the legislature was aware that guest passenger cases were *among* those actions. *Id*. at 72.

Hampton argues that *DeYoung* resolves the issue in this case, because under it comparative negligence applies to *all* torts. That argument ignores both the nature of wilful misconduct and the essential foundations for the decisions in *Johnson* and *DeYoung*. First, the legislative history on which the decisions rest suggests an intent to extend comparative fault to all situations in which the plaintiff must prove the

defendant's gross negligence; nothing in it indicates an intent to extend it to wilful or intentional conduct. Second, such an extension would be conceptually incoherent. Wilful misconduct, as the Pennsylvania decision that the Supreme Court quoted in *Falls* indicates, is qualitatively different from negligence of any sort. As the Maine court suggested, negligence consists of a continuum of fault from simple negligence through gross negligence to recklessness. Wilful misconduct is not on that continuum. It does not involve a mere neglect of responsibility, however serious; to the contrary, it involves a conscious decision to act in a way that risks harm to another. To compare Hampton's wilful misconduct with EHC's negligence, thus, is to compare conscious wrongdoing with neglect to take reasonable care. Those things are simply not comparable.

That is what the statement in ORS 18.470, that the statute is "not intended to create or abolish any defense," must mean, or it means nothing. Before the adoption of comparative fault, contributory negligence was not a defense to *any* wilful or intentional misconduct. To hold that comparative fault is now a defense to such conduct would be to create a defense that did not previously exist. It would not be simply applying comparative fault as a defense to gross negligence in a new context; it would be using comparative fault as a defense to a kind of tort for which there has never been a similar defense. That is what the statute expressly prohibits. The trial court erred in reducing the amount of the verdict by the percentage of EHC's comparative fault.

The final issue concerns Hampton's claim of setoff for the money that EHC owed it for logs and lumber drying. The jury awarded Hampton $900,000 on that claim; the court used the full amount of the award in calculating the judgment, over EHC's objection that Hampton agreed before the verdict that the court would reduce the jury's award to reflect payments that Hampton had previously received. Resolving that issue involves determining the meaning of the jury's verdict in light of a pre-verdict colloquy between court and counsel.

The evidence at trial of the amount that EHC owed Hampton consisted of John Hampton's testimony and of a

written accounting that EHC prepared of its debts as of August 1989, including interest on those debts thereafter. John Hampton testified that EHC owed $1.3 million. Before the verdict, the parties treated the accounting as showing the debt as being almost $1.4 million. Neither source expressly accounted for payments that Hampton had received, such as the certificate of deposit that was part of Jewett's guaranty.

After the close of the evidence, but before argument, the court and the parties discussed how to handle the setoff claim. EHC expressed some frustration over Hampton's failure to provide a statement of the precise amount that it claimed; without that statement, EHC could not determine how Hampton accounted for the payment from Jewett. Although the figures on EHC's exhibit were accurate, they were not complete. EHC insisted that Hampton could not ignore the Jewett payment. Hampton's attorney responded "Then I would leave it to the court to offset that amount." The court corrected the statement from "offset" to "deduct," and Hampton's attorney then stated that "the evidence is there and the testimony's unrefuted." The court then summarized how it would handle the situation:

> "Hampton will be allowed to state the maximum claim that they've computed and if legally [EHC is] entitled to a deduction because of the recovery in the prior lawsuit, we can deal with that post[verdict]."

Neither party mentioned the Jewett payment in its jury arguments. The court instructed the jury that Hampton contended that it was entitled to $1,397,472 (the amount derived from EHC's exhibit), that EHC had not disputed that it owed money to Hampton, that the disputed issue was the amount owed, and that it was the jury's responsibility to decide by a preponderance of the evidence what Hampton was entitled to recover.

After the jury found that Hampton was entitled to only $900,000, EHC sought to reduce that amount to reflect payments that Hampton received both from the Jewett certificate of deposit and also from a refund from the Internal Revenue Service, together with applicable interest. Hampton

responded, relying in part on an exhibit that was not in evidence, that the actual debt was in fact greater than $1.4 million and that the jury's verdict already reflected the payments. The court concluded that the EHC exhibit on which Hampton relied already reflected the payments and, thus, that there was no basis for a further reduction.

On appeal, EHC argues that the discussion with the court before the verdict constituted a binding stipulation that requires the court to deduct the payments from the verdict before entering judgment. Hampton argues that the purpose of the discussion was only to avoid a double recovery and that the record shows that EHC in fact owed more than the amount of the verdict. It describes a series of calculations that, it suggests, show that the jury arrived at its verdict by subtracting payments from the total amount due.

■ The foundation of Hampton's argument is that the jury had already accounted for the payments that it received. However, neither the court nor the parties asked it to do so, and we cannot conclude that it decided an issue that they did not present to it. The issue that the court and the parties presented to the jury was how much EHC owed Hampton; the amount that the court mentioned in its instructions was based on an EHC exhibit that did not show any deductions. Although Hampton argued after the verdict that the list showed that it was owed more than the court stated, that issue was not before the jury.[12] The court's pre-argument summary of the parties' discussion indicated that it expected the jury to determine the full amount owed without deductions ("the maximum claim that they've computed") and that the court would then make appropriate deductions, if any, before entering judgment.

The problem is that the jury's verdict was considerably less than either of the parties or the court thought that it would be. Although it may be tempting to speculate that the

[12] The exhibit in question listed EHC's debts as of August 31, 1989. The amount that the court stated as the maximum of Hampton's claims was the total of the items for logs payable and a note payable to Hampton. After the verdict, Hampton argued that an item for other accounts payable also reflected a debt to Hampton. That item, however, was not included in Hampton's claim as the court presented it to the jury. Because Hampton received the Jewett payment in 1991, the list also does not reflect that payment.

jury reached its figure by deducting the Jewett payment, that speculation would have no support in the way that the case was tried. Hampton's calculations of how the jury might have reached the amount of its verdict by adding on and subtracting various amounts are no less speculative. The only understanding of the verdict that is consistent with the way the case was presented is that the jury, for whatever reason, determined that the full amount of EHC's debt to Hampton was $900,000. That being the case, the pre-verdict discussion required the court to deduct the Jewett payment, and appropriate interest on it, from that amount before entering judgment.[13]

On appeal, judgment vacated and remanded with instructions to enter amended judgment making no deduction from amount awarded EHC for comparative fault and deducting Jewett payment from amount awarded Hampton; affirmed on cross-appeal.

---

[13] The other amounts that EHC allegedly owed, and the other payments that Hampton allegedly received, do not enter into these calculations because, even if they were in evidence, they were not part of the pre-verdict discussion or of how the case was presented to the jury.